# ATLAS ROOFING CO., INC. *v.* OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION ET AL.

No. 75–746.   Argued November 29, 1976—Decided March 23, 1977*

*Together with No. 75–748, *Frank Irey, Jr., Inc.* v. *Occupational Safety and Health Review Commission et al.*, on certiorari to the United States Court of Appeals for the Third Circuit.

White, J., delivered the opinion of the Court, in which all Members joined, except Blackmun, J., who took no part in the decision of the cases.

*McNeill Stokes* argued the cause for petitioners in both cases. With him on the briefs were *Ira J. Smotherman, Jr., Herbert J. Miller, Jr., Nathan Lewin, Martin D. Minsker,* and *Oliver N. Hormell.*

*Solicitor General Bork* argued the cause for respondents in both cases. With him on the brief were *Assistant Attorney*

*General Lee, Louis F. Claiborne, William J. Kilberg,* and *Michael H. Levin.*†

MR. JUSTICE WHITE delivered the opinion of the Court.

The issue in these cases is whether, consistent with the Seventh Amendment, Congress may create a new cause of action in the Government for civil penalties enforceable in an administrative agency where there is no jury trial.

## I

After extensive investigation, Congress concluded, in 1970, that work-related deaths and injuries had become a "drastic" national problem.[1]  Finding the existing state statutory rem-

---

†*Gerard C. Smetana, Jerry Kronenberg, Howard L. Mocerf, Lawrence B. Kraus,* and *Richard O'Brecht* filed a brief for the Chamber of Commerce of the United States as *amicus curiae* urging reversal in both cases.

*Warren L. Johns, Philip B. Kurland,* and *Alan L. Unikel* filed a brief for the Seventh-Day Adventist Church as *amicus curiae* urging affirmance in No. 75-748.

[1] The Senate Report stated:

"The problem of assuring safe and healthful workplaces for our working men and women ranks in importance with any that engages the national attention today. . . .  14,500 persons are killed annually as a result of industrial accidents; accordingly, during the past four years more Americans have been killed where they work than in the Vietnam war.  By the lowest count, 2.2 million persons are disabled on the job each year, resulting in the loss of 250 million man days of work—many times more than are lost through strikes.

"In addition to the individual human tragedies involved, the economic impact of industrial deaths and disability is staggering.  Over $1.5 billion is wasted in lost wages, and the annual loss to the Gross National Product is estimated to be over $8 billion.  Vast resources that could be available for productive use are siphoned off to pay workmen's compensation benefits and medical expenses.

"This 'grim current scene' . . . represents a worsening trend, for the fact is that the number of disabling injuries per million man hours worked

edies as well as state common-law actions for negligence and wrongful death to be inadequate to protect the employee population from death and injury due to unsafe working conditions, Congress enacted the Occupational Safety and Health Act of 1970 (OSHA or Act), 84 Stat. 1590, 29 U. S. C. § 651 *et seq.* The Act created a new statutory duty to avoid maintaining unsafe or unhealthy working conditions, and empowers the Secretary of Labor to promulgate health and safety standards.[2] Two new remedies were provided—permitting the Federal Government, proceeding before an administrative agency, (1) to obtain abatement orders requiring employers to correct unsafe working conditions and (2) to impose civil penalties on any employer maintaining any unsafe working condition. Each remedy exists whether or not an employee is actually injured or killed as a result of the condition, and existing state statutory and common-law remedies for actual injury and death remain unaffected.

Under the Act, inspectors, representing the Secretary of

---

is today 20% higher than in 1958." S. Rep. No. 91–1282, p. 2 (1970), Leg. Hist. 142.

See also H. R. Rep. No. 91–1291, pp. 14–15 (1970); Leg. Hist. 844–845 ("The issue of the health and safety of the American working man and woman is the most crucial one in the whole environmental question . . . the worst problem confronting American workers").

House and Senate debates are reprinted, along with the House, Senate, and Conference Reports, in a one-volume Committee Print entitled Legislative History of the Occupational Safety and Health Act of 1970, Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 92d Cong., 1st Sess. (June 1971) (cited *supra* and hereafter as Leg. Hist.).

[2] The statute provides in § 5 (a), 29 U. S. C. § 654 (a), that each employer:

"(1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees;

"(2) shall comply with occupational safety and health standards promulgated under this Act."

Labor, are authorized to conduct reasonable safety and health inspections. 29 U. S. C. § 657 (a). If a violation is discovered, the inspector, on behalf of the Secretary, issues a citation to the employer fixing a reasonable time for its abatement and, in his discretion, proposing a civil penalty. §§ 658, 659. Such proposed penalties may range from nothing for *de minimis* and nonserious violations, to not more than $1,000 for serious violations, to a maximum of $10,000 for willful or repeated violations, §§ 658 (a), 659 (a), 666 (a)–(c) and (j).

If the employer wishes to contest the penalty or the abatement order, he may do so by notifying the Secretary of Labor within 15 days, in which event the abatement order is automatically stayed. §§ 659 (a), (b), 666 (d). An evidentiary hearing is then held before an administrative law judge of the Occupational Safety and Health Review Commission. The Commission consists of three members, appointed for six-year terms, each of whom is qualified "by reason of training, education or experience" to adjudicate contested citations and assess penalties. §§ 651(3), 659 (c), 661, 666 (i). At this hearing the burden is on the Secretary to establish the elements of the alleged violation and the propriety of his proposed abatement order and proposed penalty; and the judge is empowered to affirm, modify, or vacate any or all of these items, giving due consideration in his penalty assessment to "the size of the business of the employer . . . , the gravity of the violation, the good faith of the employer, and the history of previous violations." § 666 (i). The judge's decision becomes the Commission's final and appealable order unless within 30 days a Commissioner directs that it be reviewed by the full Commission.[3] §§ 659 (c), 661 (i); see 29 CFR §§ 2200.90, 2200.91 (1976).

If review is granted, the Commission's subsequent order directing abatement and the payment of any assessed pen-

---

[3] Petitioners make no challenge to the absence of mandatory review by the Commission of the administrative law judge's findings of fact.

alty becomes final unless the employer timely petitions for judicial review in the appropriate court of appeals. 29 U. S. C. § 660 (a). The Secretary similarly may seek review of Commission orders, § 660 (b), but, in either case, "[t]he findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." § 660 (a). If the employer fails to pay the assessed penalty, the Secretary may commence a collection action in a federal district court in which neither the fact of the violation nor the propriety of the penalty assessed may be retried. § 666 (k). Thus, the penalty may be collected without the employer's ever being entitled to a jury determination of the facts constituting the violation.

## II

Petitioners were separately cited by the Secretary and ordered immediately to abate pertinent hazards after inspections of their respective worksites conducted in 1972 revealed conditions that assertedly violated a mandatory occupational safety standard promulgated by the Secretary under § 5 (a)(2) of the Act, 29 U. S. C. § 654 (a)(2). In each case an employee's death had resulted. Petitioner Irey was cited for a willful violation of 29 CFR § 1926.652 (b) and Table P–1 (1976)—a safety standard promulgated by the Secretary under the Act requiring the sides of trenches in "unstable or soft material" to be "shored, . . . sloped, or otherwise supported by means of sufficient strength to protect the employees working within them." The Secretary proposed a penalty of $7,500 for this violation and ordered the hazard abated immediately.

Petitioner Atlas was cited for a serious violation of 29 CFR §§ 1926.500 (b)(1) and (f)(5)(ii) (1976), which require that roof opening covers, be "so installed as to prevent accidental displacement." The Secretary proposed a penalty of $600 for this violation and ordered the hazard abated immediately.

Petitioners timely contested these citations and were afforded hearings before Administrative Law Judges of the

Commission. The judges, and later the Commission, affirmed the findings of violations and accompanying abatement requirements and assessed petitioner Irey a reduced civil penalty of $5,000 and petitioner Atlas the civil penalty of $600 which the Secretary had proposed. Petitioners respectively thereupon sought judicial review in the Courts of Appeals for the Third and Fifth Circuits, challenging both the Commission's factual findings that violations had occurred and the constitutionality of the Act's enforcement procedures.

A panel of the Court of Appeals for the Third Circuit affirmed the Commission's orders in the *Irey* case over petitioner's and a dissenter's contention that the failure to afford the employer a jury trial on the question whether he had violated OSHA was in violation of the Seventh Amendment to the United States Constitution which provides for jury trial in most civil suits at common law. 519 F. 2d 1200. On rehearing en banc, the Court of Appeals for the Third Circuit, over four dissents, adhered to the original panel's decision. *Id.*, at 1215. It concluded that this Court's rulings to date "leave no doubt that the Seventh Amendment is not applicable, at least in the context of a case such as this one, and that Congress is free to provide an administrative enforcement scheme without the intervention of a jury at any stage." *Id.*, at 1218.

The Court of Appeals for the Fifth Circuit also affirmed the Commission's order in the *Atlas* case over a similar claim that the enforcement scheme violated the Seventh Amendment. 518 F. 2d 990. It stated:

> "Where adjudicative responsibility rests only in the administering agency, 'jury trials would be incompatible with the whole concept of administrative adjudication and would substantially interfere with the [agency's] role in the statutory scheme.'"[4] *Id.*, at 1011.

---

[4] The other Courts of Appeals which have passed on this issue have uniformly (and without a dissent) agreed with these results. *Mohawk*

We granted the petitions for writs of certiorari limited to the important question whether the Seventh Amendment prevents Congress from assigning to an administrative agency, under these circumstances, the task of adjudicating violations of OSHA.[5]   424 U. S. 964.

## III

The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ." The phrase "Suits at common law" has been construed to refer to cases tried prior to the adoption of the Seventh Amendment in courts of law in which jury trial was customary as distinguished from courts of equity or admiralty in which jury trial was not. *Parsons* v. *Bedford,* 3 Pet. 433 (1830). Petitioners claim that a suit in a federal court by the Government for civil penalties for violation of a statute is a suit for a money judgment which is classically a suit at common law, *Whitehead* v. *Shattuck,* 138 U. S. 146, 151 (1891); and that the defendant therefore has a Seventh Amendment right to a jury determination of all issues of fact in such a case, see *Hepner* v. *United States,* 213 U. S. 103, 115 (1909) (dictum); *United States* v. *Regan,* 232 U. S. 37, 47 (1914) (dictum).[6]

---

*Excavating, Inc.* v. *Occupational Safety & Health Rev. Comm'n,* 549 F. 2d 859 (CA2 1977); *Beall Constr. Co.* v. *Occupational Safety & Health Rev. Comm'n,* 507 F. 2d 1041 (CA8 1974); *Brennan* v. *Winters Battery Mfg. Co.,* 531 F. 2d 317 (CA6 1975); *Clarkson Constr. Co.* v. *Occupational Safety & Health Rev. Comm'n,* 531 F. 2d 451 (CA10 1976). See also *Underhill Constr. Corp.* v. *Secretary of Labor,* 526 F. 2d 53, 57 n. 10 (CA2 1975).

[5] Each petitioner also argued below that the enforcement scheme violates the constitutional requirements that juries decide fact issues in criminal cases—arguing that the fines involved are "penal" in nature. Each petitioner asked this Court in its petition for a writ of certiorari to review the unfavorable rulings of the courts below on this issue.

[6] In light of our disposition of these cases we decline the respondents' invitation to decide whether the dictum in these cases correctly divines the intent of the Seventh Amendment or whether, as the respondents

Petitioners then claim that to permit Congress to assign the function of adjudicating the Government's rights to civil penalties for violation of the statute to a different forum—an administrative agency in which no jury is available—would be to permit Congress to deprive a defendant of his Seventh Amendment jury right. We disagree. At least in cases in which "public rights" are being litigated—*e. g.,* cases in which the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact—the Seventh Amendment does not prohibit Congress from assigning the factfinding function and initial adjudication to an administrative forum with which the jury would be incompatible.[7]

Congress has often created new statutory obligations, provided for civil penalties for their violation, and committed exclusively to an administrative agency the function of deciding whether a violation has in fact occurred. These statutory schemes have been sustained by this Court, albeit often without express reference to the Seventh Amendment. Thus taxes may constitutionally be assessed and collected together with penalties, with the relevant facts in some instances being adjudicated only by an administrative agency. *Phillips v. Commissioner,* 283 U. S. 589, 599–600 (1931); *Murray's*

argue, the Seventh Amendment has no application to Government litigation and leaves solely to the Sixth Amendment the function of interposing a jury between the Federal Government and an individual from whom it wishes to exact a fine. See *Muniz* v. *Hoffman,* 422 U. S. 454 (1975).

[7] These cases do not involve purely "private rights." In cases which do involve only "private rights," this Court has accepted factfinding by an administrative agency, without intervention by a jury, only as an adjunct to an Art. III court, analogizing the agency to a jury or a special master and permitting it in admiralty cases to perform the function of the special master. *Crowell* v. *Benson,* 285 U. S. 22, 51–65 (1932). The Court there said: "On the common law side of the federal courts, the aid of juries is not only deemed appropriate but is required by the Constitution itself." *Id.,* at 51.

*Lessee* v. *Hoboken Land Co.,* 18 How. 272, 284 (1856).[8] Neither of these cases expressly discussed the question whether the taxation scheme violated the Seventh Amendment. However, in *Helvering* v. *Mitchell,* 303 U. S. 391 (1938), the Court said, in rejecting a claim under the Sixth Amendment that the assessment and adjudication of tax penalties could not be made without a jury, that "the determination of the facts upon which liability is based may be by an administrative agency instead of a jury," *id.,* at 402. Similarly, Congress has entrusted to an administrative agency the task of adjudicating violations of the customs and immigration laws and assessing penalties based thereon. *Lloyd Sabaudo Societa* v. *Elting,* 287 U. S. 329, 335 (1932) ("[D]ue process of law does not require that the courts, rather than administrative officers, be charged . . . with determining the facts upon which the imposition of [fines] depends"); *Oceanic Nav. Co.* v. *Stranahan,* 214 U. S. 320 (1909).[9] See also *Ex parte Bakelite Corp.,* 279 U. S. 438, 451, 458 (1929).

In *Block* v. *Hirsh,* 256 U. S. 135 (1921), the Court sustained Congress' power to pass a statute, applicable to the District of Columbia, temporarily suspending landlords' legal remedy of ejectment and relegating them to an administrative fact-

---

[8] In *Murray's Lessee,* the Court stated:

"[T]here are matters, *involving public rights,* which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but *which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper."* 18 How., at 284. (Emphasis added.)

[9] In *Oceanic,* the Court stated:

"In accord with this settled judicial construction the legislation of Congress from the beginning, not only as to tariff, but as to internal revenue, taxation, *and other subjects,* has proceeded on the conception that *it was within the competency of Congress, when legislating as to matters exclusively within its control,* to impose appropriate obligations and sanction their enforcement by reasonable money penalties, *giving to executive officers the power to enforce such penalties without the necessity of invoking the judicial power."* 214 U. S., at 339. (Emphasis added.)

finding forum charged with determining fair rents at which tenants could hold over despite the expiration of their leases. In that case the Court squarely rejected a challenge to the statute based on the Seventh Amendment, stating:

"The statute is objected to on the further ground that landlords and tenants are deprived by it of a trial by jury on the right to possession of the land. *If the power of the Commission established by the statute to regulate the relation is established,* as we think it is, by what we have said, *this objection amounts to little. To regulate the relation and to decide the facts affecting it are hardly separable." Id.,* at 158. (Emphasis added.)

In *Crowell* v. *Benson,* 285 U. S. 22 (1932), apparently referring to the above-cited line of authority, the Court stated:

"[T]he distinction is at once apparent between cases of private right and those which arise *between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments. . . .* [T]he Congress, in exercising the powers confided to it may establish 'legislative' courts . . . to serve as special tribunals 'to examine and determine various matters, arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it.' But *'the mode of determining matters of this class is completely within congressional control.* Congress may reserve to itself the power to decide, *may delegate that power to executive officers,* or may commit it to judicial tribunals.' . . . Familiar illustrations of *administrative agencies created for the determination of such matters are found in connection with the exercise of the congressional power as to interstate* and foreign *commerce,* taxation, immigration, the public lands, public health, the facilities of the post office, pensions and payments to veterans." *Id.,* at 50–51. (Emphasis added.)

In *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1 (1937), the Court squarely addressed the Seventh Amendment issue involved when Congress commits the factfinding function under a new statute to an administrative tribunal. Under the National Labor Relations Act, Congress had committed to the National Labor Relations Board, in a proceeding brought by its litigating arm, the task of deciding whether an unfair labor practice had been committed and of ordering backpay where appropriate. The Court stated:

> "The instant case is not a suit at common law or in the nature of such a suit. The proceeding is one unknown to the common law. *It is a statutory proceeding.* Reinstatement of the employee and payment for time lost *are requirements* [*administratively*] *imposed for violation of the statute and are remedies appropriate to its enforcement.* The contention under the Seventh Amendment is without merit." *Id.,* at 48–49. (Emphasis added.) [10]

---

[10] The Court also rejected the Seventh Amendment claim in *Jones & Laughlin* on the separate ground that that Amendment is inapplicable where "recovery of money damages is an incident to [nonlegal] relief even though damages might have been recovered in an action at law," 301 U. S., at 48–49, since in such cases courts of equity would historically have granted monetary relief. In *Jones & Laughlin,* the NLRB ordered reinstatement of a dismissed employee, an order analogous to injunctive relief historically obtainable only in a court of equity, and consequently this alternative ground was an adequate one to decide *Jones & Laughlin.* However, this alternative ground would have been insufficient to decide the more general question of the NLRB's power to order backpay where, for one reason or another, no such equitable order was sought. See *Radio Officers* v. *NLRB,* 347 U. S. 17, 54 (1954); *NLRB* v. *National Garment Co.,* 166 F. 2d 233 (CA8 1948); *NLRB* v. *Brookside Industries, Inc.,* 308 F. 2d 224 (CA4 1962); *Bon Hennings Logging Co.* v. *NLRB,* 308 F. 2d 548 (CA9 1962); *NLRB* v. *West Coast Casket Co., Inc.,* 205 F. 2d 902 (CA9 1953); *Reliance Mfg. Co.* v. *NLRB,* 125 F. 2d 311 (CA7 1941); *NLRB* v. *Carpenters,* 238 F. 2d 832 (CA5 1956); *Indianapolis Power & Light Co.* v. *NLRB,* 122 F. 2d 757 (CA7 1941).

This passage from *Jones & Laughlin* has recently been explained in *Curtis* v. *Loether,* 415 U. S. 189 (1974), in which the Court held the Seventh Amendment applicable to private damages suits in federal courts brought under the housing discrimination provisions of the Civil Rights Act of 1968. The Court rejected the argument that *Jones & Laughlin* held the Seventh Amendment inapplicable to any action based on a statutorily created right even if the action was brought before a tribunal which customarily utilizes a jury as its factfinding arm. Instead, we concluded that *Jones & Laughlin* upheld

> "congressional power to entrust enforcement of statutory rights to *an administrative process or specialized court of equity* [11] free from the strictures of the Seventh Amendment." 415 U. S., at 194–195. (Emphasis added.)

Finally, in *Pernell* v. *Southall Realty,* 416 U. S. 363 (1974),[12] in discussing *Block* v. *Hirsh,* 256 U. S. 135 (1921), and *Jones & Laughlin,* we stated:

> "*Block* v. *Hirsh* merely stands for the principle that *the Seventh Amendment is generally inapplicable in administrative proceedings, where jury trials would be incompatible with the whole concept of administrative adjudication.* . . . We may assume that the Seventh Amendment would not be a bar to a congressional effort to

---

[11] The Court had reference to *Katchen* v. *Landy,* 382 U. S. 323 (1966), in which this Court sustained the power of a bankruptcy court, exercising summary jurisdiction without a jury, to adjudicate the otherwise legal issues of voidable preferences. The Court did so on the ground that a bankruptcy court, exercising its summary jurisdiction, was a specialized court of equity and constituted a forum before which a jury would be out of place and would go far to dismantle the statutory scheme.

[12] The holding in *Pernell* was that the Seventh Amendment applies to resolution of disputes of a "legal" nature—those regarding right to possession of real property when the resolution is entrusted to a forum which customarily employs a jury.

entrust landlord-tenant disputes, including those over the right to possession, to an administrative agency. Congress has not seen fit to do so, however, but rather has provided that actions under § 16–1501 be brought as ordinary civil actions in the District of Columbia's court of general jurisdiction. Where it has done so, and where the action involves rights and remedies recognized at common law, it must preserve to parties their right to a jury trial." 416 U. S., at 383. (Emphasis added.)

In sum, the cases discussed above stand clearly for the proposition that when Congress creates new statutory "public rights," it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that jury trial is to be "preserved" in "suits at common law."[13] Congress is not required by the Seventh Amendment to choke the already crowded federal courts with new types of litigation or prevented from committing some new types of litigation to administrative agencies with special competence in the relevant field. This is the case even if the Seventh Amendment would have required a jury where the adjudication of those rights is assigned to a federal court of law instead of an administrative agency. Petitioners would nevertheless have us disregard the interpretation of *Jones & Laughlin* which we recently espoused in *Curtis* v. *Loether* and *Pernell* v. *Southall Realty,* reading it instead as a holding solely that the entire proceeding before the NLRB was really equitable in nature; and they would have us entirely disregard *Block* v.

---

[13] We note that the decision of the administrative tribunal in these cases on the law is subject to review in the federal courts of appeals, and on the facts is subject to review by such courts of appeals under a substantial-evidence test. Thus, these cases do not present the question whether Congress may commit the adjudication of public rights and the imposition of fines for their violation to an administrative agency without any sort of intervention by a court at any stage of the proceedings.

*Hirsh, supra.* They would have us disregard the dictum in *Crowell* v. *Benson,* 285 U. S. 22 (1932), that the adjudication of congressionally created public rights may be assigned to administrative agencies, as well as the similar holdings in *Lloyd Sabaudo Societa* v. *Elting,* 287 U. S. 329 (1932); *Oceanic Nav. Co.* v. *Stranahan,* 214 U. S. 320 (1909); *Murray's Lessee* v. *Hoboken Land Co.,* 18 How. 272 (1856); *Phillips* v. *Commissioner,* 283 U. S. 589 (1931); and *Helvering* v. *Mitchell,* 303 U. S. 391 (1938).

None of the grounds tendered for so reinterpreting the Seventh Amendment is convincing. It is suggested that in some of the cases, *Elting, Oceanic, Murray's Lessee, Phillips,* and *Helvering,* the Seventh Amendment was not expressly put in issue. But these cases are clear enough that in the context involved, there was no requirement that the courts be involved at all in the factfinding process in the first instance. It is difficult to believe that these holdings or dicta did not subsume the proposition that a jury trial was not required. Furthermore, there are the remaining cases where the Court expressly held or observed that the Seventh Amendment did not bar administrative factfindings. *Jones & Laughlin, Block, Pernell,* and *Curtis.*

Second, it is argued with some force that cases such as *Murray's Lessee, Elting, Oceanic, Phillips,* and *Helvering* all deal with the exercise of sovereign powers that are inherently in the exclusive domain of the Federal Government and critical to its very existence—the power over immigration, the importation of goods, and taxation—and that the theory of those cases is inapplicable where the Government exercises other powers that petitioners apparently regard as less fundamental, less exclusive, and less vital to the existence of the Nation, such as the power to regulate commerce among the several States, the latter being the power Congress sought to exercise in enacting the statute at issue here. The difficulty with this argument is that the Court in these cases, and in

others, did not appear to confine its holdings in this manner. In *Murray's Lessee* the Court referred to "matters, involving public rights [that] congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." 18 How., at 284. In *Oceanic,* which sustained the administrative imposition of a fine for the wrongful importation of aliens, the Court said that its ruling was in accordance with "settled judicial construction" that "not only as to tariff but as to internal revenue, taxation and *other subjects*" Congress could "impose appropriate obligations and sanction their enforcement by reasonable money penalties, giving to executive officers the power to enforce such penalties without the necessity of invoking the judicial power." 214 U. S., at 339. (Emphasis added.) *Crowell* spoke broadly of the distinction between cases of private right and those which arise between the Government and persons subject to its authority "in connection with the performance of the constitutional functions of the executive or legislative departments," see *supra,* at 452, and gave "familiar illustrations" of the permissible use of administrative agencies in connection with the exercise of such congressional powers as "interstate and foreign commerce." 285 U. S., at 51. *Helvering* v. *Mitchell, supra,* at 402–403, relying on *Oceanic* and similar cases, stated simply that "the determination of the facts upon which liability is based may be by an administrative agency instead of a jury." It is also apparent that *Jones & Laughlin, Pernell,* and *Curtis* are not amenable to the limitations suggested by petitioners.

Third is the assertion that the right to jury trial was never intended to depend on the identity of the forum to which Congress has chosen to submit a dispute; otherwise, it is said, Congress could utterly destroy the right to a jury trial by always providing for administrative rather than judicial resolution of the vast range of cases that now arise in the courts.

The argument is well put, but it overstates the holdings of our prior cases and is in any event unpersuasive. Our prior cases support administrative factfinding in only those situations involving "public rights," *e. g.,* where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights. Wholly private tort, contract, and property cases, as well as a vast range of other cases, are not at all implicated.

More to the point, it is apparent from the history of jury trial in civil matters that factfinding, which is the essential function of the jury in civil cases, *Colgrove* v. *Battin,* 413 U. S. 149, 157 (1973), was never the exclusive province of the jury under either the English or American legal systems at the time of the adoption of the Seventh Amendment; and the question whether a fact would be found by a jury turned to a considerable degree on the nature of the forum in which a litigant found himself. Critical factfinding was performed without juries in suits in equity, and there were no juries in admiralty, *Parsons* v. *Bedford,* 3 Pet. 433 (1830); nor were there juries in the military justice system. The jury was the factfinding mode in most suits in the common-law courts, but it was not exclusively so: Condemnation was a suit at common law but constitutionally could be tried without a jury, *Kohl* v. *United States,* 91 U. S. 367, 375–376 (1876); *Bauman* v. *Ross,* 167 U. S. 548, 593 (1897); *United States* v. *Reynolds,* 397 U. S. 14, 18 (1970). "[M]any civil as well as criminal proceedings at common law were without a jury." *Kohl* v. *United States, supra,* at 376. The question whether a particular case was to be tried in a court of equity—without a jury— or a court of law—with a jury—did not depend on whether the suit involved factfinding or on the nature of the facts to be found. Factfinding could be a critical matter either at law or in equity. Rather, as a general rule, the decision turned on whether courts of law supplied a cause of action and an

adequate remedy to the litigant.[14]   If it did, then the case would be tried in a court of law before a jury.   Otherwise the case would be tried to a court of equity sitting without a jury. Thus, suits for damages for breach of contract, for example, were suits at common law with the issues of the making of the contract and its breach to be decided by a jury; but specific performance was a remedy unavailable in a court of law and where such relief was sought the case would be tried in a court of equity with the facts as to making and breach to be ascertained by the court.

The Seventh Amendment was declaratory of the existing law, for it required only that jury trial in suits at common law was to be "preserved."   It thus did not purport to require a jury trial where none was required before.   Moreover, it did not seek to change the factfinding mode in equity or admiralty or to freeze equity jurisdiction as it existed in 1789, preventing it from developing new remedies where those available in courts of law were inadequate.   *Ross* v. *Bernhard,* 396 U. S. 531 (1970), is instructive in this respect.   We there held that a jury trial is required in stockholder derivative suits where, if the corporation itself had sued, a jury trial would have been available to the corporation.   It is apparent, however, that prior to the 1938 Federal Rules of Civil Procedure merging the law and equity functions of the federal courts, the very suit involved in *Bernhard* would have been in a court of equity sitting without a jury, not because the underlying issue was any different at all from the issue the corporation would have presented had it sued, but because the stockholder plaintiff who was denied standing in a court of law to sue on the issue was enabled in proper circumstances, starting in the early part

---

[14] The Judiciary Act of 1789, 1 Stat. 82, which was in this respect declaratory of existing law, provided:

"Sec. 16.   *And be it further enacted,* That suits in equity shall not be sustained in either of the courts of the United States, in any case where plain, adequate and complete remedy may be had at law."

of the 19th century, to sue in equity on behalf of the company.

The point is that the Seventh Amendment was never intended to establish the jury as the exclusive mechanism for factfinding in civil cases. It took the existing legal order as it found it, and there is little or no basis for concluding that the Amendment should now be interpreted to provide an impenetrable barrier to administrative factfinding under otherwise valid federal regulatory statutes. We cannot conclude that the Amendment rendered Congress powerless— when it concluded that remedies available in courts of law were inadequate to cope with a problem within Congress' power to regulate—to create new public rights and remedies by statute and commit their enforcement, if it chose, to a tribunal other than a court of law—such as an administrative agency—in which facts are not found by juries. Indeed, as the *Oceanic* opinion said, the "settled judicial construction" was to the contrary "from the beginning." 214 U. S., at 339. That case indicated, as had *Hepner* v. *United States,* 213 U. S. 103 (1909), that the Government could commit the enforcement of statutes and the imposition and collection of fines to the judiciary, in which event jury trial would be required, see also *United States* v. *Regan,* 232 U. S. 37 (1914), but that the United States could also validly opt for administrative enforcement, without judicial trials. See also *Helvering* v. *Mitchell,* 303 U. S., at 402–403, and *Crowell* v. *Benson,* 285 U. S., at 50–51.[15]

Thus, history and our cases support the proposition that the

---

[15] Finally, it should be noted that, if the fines involved in these cases were made criminal fines instead of civil fines, the Seventh Amendment would be inapplicable by its terms. The Sixth Amendment would then govern the employer's right to a jury and under our prior cases no jury trial would be required. *Muniz* v. *Hoffman,* 422 U. S. 454 (1975). It would be odd to hold that Congress could avoid the jury-trial requirement by labeling the civil penalties criminal fines but not by assigning their adjudication to an administrative agency.

right to a jury trial turns not solely on the nature of the issue to be resolved but also on the forum in which it is to be resolved.[16]   Congress found the common-law and other existing remedies for work injuries resulting from unsafe working conditions to be inadequate to protect the Nation's working men and women.   It created a new cause of action, and remedies therefor, unknown to the common law, and placed their enforcement in a tribunal supplying speedy and expert resolutions of the issues involved.   The Seventh Amendment is no bar to the creation of new rights or to their enforcement outside the regular courts of law.

The judgments below are affirmed.

*It is so ordered.*

MR. JUSTICE BLACKMUN took no part in the decision of these cases.

---

[16] Petitioners claim that permitting Congress to control the jury-right question by picking the forum is to delegate to it, rather than this Court, the final power to decide Seventh Amendment issues.   The claim is incorrect.   The Seventh Amendment prevents Congress from depriving a litigant of a jury trial in a "legal" action before a tribunal customarily utilizing a jury as its factfinding arm, *Pernell* v. *Southall Realty,* 416 U. S. 363 (1974), and this Court has the final decision on the question whether a jury is required.