704 F.2d 1313
 8 Collier Bankr.Cas.2d 467, 10 Bankr.Ct.Dec. 763,
Bankr. L. Rep. P 69,277
 1616 REMINC LIMITED PARTNERSHIP, Appellant,
v.
ATCHISON & KELLER COMPANY; Atchison & Keller, Inc.; Roland
E. Kinser; Tony Yaksh; Peerless Insurance
Company; Appellees.
In re 1616 REMINC LIMITED PARTNERSHIP, Debtor.
 No. 82-1284.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 10, 1983.
Decided April 14, 1983.
 
 Mark C. Ellenberg, Washington, D.C. (Stephen N. Shulman, Cadwalader, Wickersham & Taft, Washington, D.C., James A. Newell, Arlington, Va., Holywell Corp., Miami, Fla., on brief), for appellant.
 Mark P. Friedlander, Arlington, Va. (Friedlander & Brooks P.C., Robert C. Coleburn, Simmonds, Coleburn & Towner, Arlington, Va., Alexander M. Heron, Holland & Knight, Washington, D.C., on brief), for appellees.
 Before WINTER, Chief Judge, CHAPMAN, Circuit Judge, and HAYNSWORTH, Senior Circuit Judge.
 HARRISON L. WINTER, Chief Judge:
 
 
 1
 The issue presented by this case is whether Rule 810, Rules of Bankruptcy Procedure, unconstitutionally transfers the exercise of "the judicial power" of the United States from an Article III court to a non-Article III bankruptcy referee[1] sitting under the 1898 Bankruptcy Act, by limiting the district court to the "clearly erroneous" standard when reviewing a compulsory breach of contract counterclaim adjudicated in the bankruptcy court. We hold that it does, and therefore remand to permit independent fact-finding by the district court. Because the other issues raised on appeal, with one exception noted below, infra note 10, are intertwined with the district court's reconsideration on remand, we do not reach them. We also conclude that our holding must apply only prospectively.
 
 I.
 
 2
 1616 Reminc Limited Partnership (Reminc) is a debtor-in-possession in a Chapter XII proceeding begun in 1975. Its principal asset is a Rosslyn, Virginia, office building which it commissioned to be built in 1973 by CITCON Corporation. CITCON in turn executed a standard form subcontract with Atchison & Keller Company (A & K) for installation of a heating, ventilation and air conditioning (HVAC) system in the building. A & K's duties included construction of a chamber in which circulating air is heated over electrical elements known as reheat coils before being pumped throughout the building. Reset switches designed to detect overheating of the reheat coils were incorporated into the assembly to prevent irreparable damage to the coils. The subcontract and plans called for A & K to install two reset switches, one automatic and the other manual, and designated four possible approved suppliers of parts for the overall system.
 
 
 3
 When operating properly, the automatic reset switch would shut off the reheat coils if they began to overheat, allow cooling, then reactivate the coils, so as to provide uninterrupted heating to the building. The manual reset was planned as a back-up safety feature. The system originally installed in Reminc's building, however, failed to work as planned. The major problem was that the manual reset switch consistently activated before the automatic, leaving tenants without heat until maintenance personnel could reset the manual switches in each of the numerous air outlets throughout the system. Reminc lost tenants and eventually sought bankruptcy protection, filing its initial petition in August 1975.
 
 
 4
 A & K subsequently filed a proof of claim based upon a purported mechanic's lien against the office building. Reminc objected to the claim and, on July 22, 1976, filed a compulsory counterclaim alleging breach of contract[2] against A & K, its principals, and its surety Peerless Insurance Company.
 
 
 5
 After dismissal of A & K's claim, Reminc's contract action proceeded to trial before the bankruptcy referee, who found against Reminc on motion for directed verdict. On appeal, the district court reversed and remanded for additional fact-finding. Further proceedings were conducted on January 27, 1981. The referee again denied Reminc relief, relying primarily on a factual finding that the cause of the reset switches' malfunctioning was another subcontractor's faulty construction of the airshaft leading to the heating chamber, and not A & K's workmanship nor material selection.[3] The district court affirmed on February 17, 1982, deferring to the bankruptcy court's election "not to give full credence to Reminc's evidence" which the district court understood to be the referee's "prerogative in view of the conflict in the evidence."
 
 II.
 
 6
 Before us Reminc ascribes many errors to the proceedings below, among them the district court's adherence to the "clearly erroneous" standard of review found in Rule 810 of the Rules of Bankruptcy Procedure. Essentially, Reminc argues that application of Rule 810 here resulted in its compulsory[4] breach of contract counterclaim being fully adjudicated in the first instance by a concededly non-Article III official[5] without the possibility of independent fact-finding by the district court. It contends that adjudication of its claim by an Article I judge under these circumstances violates principles of Article III jurisprudence. Reminc does not attack the power of bankruptcy referees under the 1898 Bankruptcy Act[6] generally, but only adjudications in cases such as this involving common law contract claims and turning on questions of fact. Because of our disposition of this constitutional challenge to Rule 810, we do not reach the merits of Reminc's other claims.[7]
 
 A.
 
 7
 We begin by considering the effect of Rule 810 in this case. Rule 810 states:
 
 
 8
 Upon an appeal the district court may affirm, modify, or reverse a referee's judgment or order, or remand with instructions for further proceedings. The court shall accept the referee's findings of fact unless they are clearly erroneous, and shall give due regard to the opportunity of the referee to judge the credibility of the witnesses.
 
 
 9
 13 Collier on Bankruptcy 8-77 (14th ed. 1977). The rule requires " 'the same effect to be given the referee's findings as Rule 52(a) of the Federal Rules of Civil Procedure accords to the findings of the trial court.' " Id. at p 810.01, quoting Advisory Committee's Note to Rule 810. This limitation on review of referee fact-finding perpetuates the "clearly erroneous" standard of former Gen. Order in Bankruptcy No. 47, 305 U.S. 679 (1935); indeed, when General Order 47 was revised into Rule 810, the provision allowing the district judge to "receive further evidence" was abandoned, strengthening the degree of deference. 2A Collier on Bankruptcy p 39.28 (14th ed. 1978).
 
 
 10
 We have long given effect to this standard, and we have not hesitated to reverse where a district court too readily substituted its view of the facts for the bankruptcy court's, particularly where witness credibility played a role in the referee's decision. See, e.g., Melichar v. Ost, 661 F.2d 300 (4 Cir.1981), cert. denied, 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 442 (1982); Mountain Trust Bank v. Shifflett, 255 F.2d 718, 720 (4 Cir.1958); Mutual Savings & Loan Association v. McCants, 183 F.2d 423, 426-27 (4 Cir.1950).[8] Reminc's constitutional challenge to Rule 810 manifestly is an unanticipated one raising issues of first impression.
 
 B.
 
 11
 We consider next if we should address the issue. Reminc suggests that Rule 810's unconstitutionality follows inexorably from the holding and the principles articulated in Northern Pipeline Construction Co. v. Marathon Pipeline Co., --- U.S. ----, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). But A & K, in arguing that we should not decide the issue, correctly points out that the Marathon Pipeline Court expressly stayed the effect of its decision first until October 4, 1982, --- U.S. at ----, 102 S.Ct. at 2880, and subsequently until and including December 24, 1982, --- U.S. ----, 103 S.Ct. 200, 74 L.Ed.2d 160, at which point the decision began to apply only prospectively. --- U.S. at ----, 102 S.Ct. at 2880. The Court foresaw that general retroactive application of its holding "would surely visit substantial injustice and hardship upon those litigants who relied upon the Act's vesting of jurisdiction in the bankruptcy courts." Id. A & K therefore argues that we should not address this issue.
 
 
 12
 We do not think that we should decline decision now. First, this case does not present the same issue decided in Marathon. Even though the principles invoked and applied in Marathon are the same which govern decision here, Marathon dealt with only the powers of bankruptcy judges under the 1978 Bankruptcy Act. We are concerned with the validity of a rule promulgated under the 1898 Bankruptcy Act. Second, Reminc's challenge to the validity of the rule was initiated and argued prior to the decision in Marathon.[9] Reminc therefore is not now before us claiming a windfall from any change in the law wrought by Marathon. Cf. Ramey v. Harber, 589 F.2d 753 (4 Cir.1978), cert. denied, 442 U.S. 910, 99 S.Ct. 2823, 61 L.Ed.2d 275 (1979). Whatever Marathon may teach with respect to retroactive and prospective application of what we decide, we think that it would be inequitable to deprive Reminc of its prescience in discerning the constitutional infirmity in Rule 810 when the rule is applied in the context of this case.
 
 C.
 
 13
 Turning to the merits, we note first that the degree to which plenary power to adjudicate traditional common law contract claims may be vested in a federal tribunal without full Article III trappings has never been fully defined. In Katchen v. Landy, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966), decided before Rule 810 abrogated General Order 47 and thereby jettisoned district court de novo fact-finding, the Article III issue was not addressed. Instead, the Court at most held that a bankruptcy court could adjudicate in summary fashion the claims of a creditor and counterclaims against the creditor generally without violating the Seventh Amendment's guarantee to a trial by jury. Significantly, the Court characterized the creditor's affirmative assertion of a preference as but "an equitable claim to a pro rata share of the res", 382 U.S. at 336, 86 S.Ct. at 476, a claim shaped by Congressional enactment. By contrast, Reminc's litigation here involves "breach of contract ... and other counts which are the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." Marathon Pipeline, supra, --- U.S. at ----, 102 S.Ct. at 2881 (Rehnquist, J., concurring).[10]
 
 
 14
 In addition, in conducting a full trial covering all aspects of Reminc's contract claim while shielded by Rule 810, the bankruptcy referee was more than an "adjunct" of the district court.[11] Thus, neither Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), nor United States v. Raddatz, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), endorsed the extent of control over Reminc's contract action effectively vested in the bankruptcy court by Rule 810. The "judicial power" required by Article III to be exercised by courts possessing certain attributes of political independence from the other branches of government has long been considered to include unprescribed consideration of facts as well as decision of questions of law. Crowell v. Benson, 285 U.S. at 57, 52 S.Ct. at 295; see generally Note, Article III Limits on Article I Courts: The Constitutionality of the Bankruptcy Court and the 1979 Magistrate Act, 80 Colum.L.Rev. 560, 591-92 (1980). And Reminc's contract claim is not included among the many matters over which Congress possesses well-established power to commit to the authority of administrative agencies or legislative courts. See, e.g., Atlas Roofing Company v. Occupational Safety Commission, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977); Palmore v. United States, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973); American Insurance Co. v. Canter, 26 U.S. (1 Pet.) 511, 7 L.Ed. 242 (1828); Crowell v. Benson, supra; NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937).
 
 
 15
 We therefore decide in part a question frequently reserved, "the extent to which Congress may commit the execution of even 'inherently' judicial business to tribunals other than Article III courts." Glidden v. Zdanok, 370 U.S. 530, 549, 82 S.Ct. 1459, 1472, 8 L.Ed.2d 671 (1962) (opinion of Harlan, J.) The issue is not diminished because Rule 810 came into being as an Order of the Supreme Court rather than as an Act of Congress. As the Court has been careful to point out, "The fact that this Court promulgated the rules as formulated and recommended by the Advisory Committee does not foreclose consideration of their validity, meaning or consistency." Mississippi Publishing Corp. v. Murphree, 326 U.S. 438, 444, 66 S.Ct. 242, 245, 90 L.Ed. 185 (1946) (ultimately upholding validity of Rule 4(f), Fed.R.Civ.P.). To be sure, Congress generally enjoys the flexibility to "make a particular allocation to a non-Article III tribunal if functional considerations subserving a valid legislative purpose justify it (and if there is adequate provision for judicial review)." P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 396 (2d ed. 1973) (emphasis original).[12] But although Congress may in many instances pursue a valid legislative purpose by establishing a deferential statutory standard of judicial review,[13] here a court-adopted rule insulates a non-Article III official without the imperative of a Congressional directive to do so. This lack of Congressionally crafted purpose weakens the rule's stature in the present context.
 
 
 16
 Under the circumstances of this case, then, we conclude that the application of Rule 810 unconstitutionally vested the non-Article III bankruptcy referee with too great a measure of the judicial power of the United States. Reminc pursued its cause of action in the bankruptcy court not by choice, but by virtue of its position as debtor-in-possession responding by compulsory counterclaim to A & K's prior filing of a claim against it.[14] The bankruptcy judge exercised full adjudicative powers in disposing of the breach of contract matter in the first instance. Although the district court properly reviewed on appeal the adequacy of the bankruptcy judge's disposition, remanded once for further proceedings, and again on a second appeal gave careful and searching scrutiny to the record and issues raised prior to affirming, indisputably Rule 810's "clearly erroneous" standard was applied throughout. The challenged Rule thus insured transgression of the narrow but distinct principle that "a 'traditional' state common-law action, not made subject to a federal rule of decision, and related only peripherally to an adjudication of bankruptcy under federal law, must, absent the consent of the litigants, be heard by an 'Article III court' if it is to be heard by any court or agency of the United States." Marathon Pipeline, --- U.S. at ----, 102 S.Ct. at 2882 (dissenting opinion of Burger, C.J.).[15]
 
 III.
 
 17
 We turn now to the effect of our ruling. Although by no means as sweeping a disturbance of the bankruptcy adjudication scheme as that effected in Marathon Pipeline, our decision here nonetheless meets all three parts of the test of prospectivity stated in Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). We decide an issue of first impression, retroactive application of which will do little to further its operation, while instead adding still greater uncertainty to an already unsettled situation. This court has stated previously:
 
 
 18
 Nothing in the Constitution prevents use of the technique of prospective limitation or prospective overruling. It is a developing technique of great usefulness in lending protection to those who had placed their reliance upon the earlier rule against the harsh impact of ex post facto change. It has been employed by many courts. The Supreme Court has made the technique widely familiar as a limitation upon the retroactivity of even constitutional doctrine.
 
 
 19
 Lester v. McFaddon, 415 F.2d 1101, 1107 (4 Cir.1969) (footnotes omitted).
 
 
 20
 In holding that our decision regarding Rule 810 applies only prospectively, we do not deprive Reminc of the benefit of its foresight. As we have noted in prior cases, "In the Supreme Court, the prospective rule has usually been applied in the case in which it is first announced." United States v. Allen, 542 F.2d 630, 634 (4 Cir.1976), cert. denied, 430 U.S. 908, 97 S.Ct. 1179, 51 L.Ed.2d 584 (1977). Although "not an inevitable requirement", id., application to the instant case is the better practice so as to avoid rendering a merely advisory opinion.[16] To require a remand in this case, we expect, will work only a minimum disruption; we are aware of no other cases involving a like challenge to "clearly erroneous" review actually raised in a bankruptcy proceeding prior to the decision in Marathon Pipeline. In any case reviewed by a district court after December 24, 1982, the standard of review is no longer the "clearly erroneous" standard.[17]
 
 
 21
 Accordingly, we remand this case to the district court for reconsideration of its disposition of the appeal from the bankruptcy court. On remand the district court will be free to hear such evidence as it believes necessary for resolution of the issues involved. In its review of the bankruptcy proceedings, the district court will be guided by the provisions of the district court's local rule adopted in compliance with Sec. (e)(2)(B) of Order No. 3 of the Circuit Council of this circuit, at least until such time as Congress may prescribe a different scope of review.
 
 
 22
 VACATED AND REMANDED.
 
 
 
 [1]
 Although "judge" is the more precise designation since promulgation of Bankruptcy Rule 901, 411 U.S. 1091, 93 S.Ct. 3165, 37 L.Ed.2d lxxv (1973), we will use the term "referee" to distinguish these proceedings under the 1898 Bankruptcy Act. See infra note 6
 
 
 [2]
 Reminc asserted liability on the theories of express and implied warranty under Virginia common law, as well as Secs. 8.2-314 and 8.2-315, 2A Code of Virginia (1965 added vol.), the warranty provisions of the Virginia Commercial Code
 
 
 [3]
 The bankruptcy court also found that Reminc had failed to satisfy two conditions precedent to suit against the surety Peerless on the bond: by giving untimely notice of intent to sue, and by filing the suit beyond the time specified. These rulings, also affirmed by the district court, involve factual determinations equally as complex as those of the breach of contract claim. For the reasons that follow in the text, we also leave their redetermination to the district court on remand. We note, however, that both courts below were correct as a matter of law that A & K is liable directly on its contract through the assignment to Reminc by CITCON, the general contractor, making the satisfaction of the bond conditions irrelevant to A & K's liability
 
 
 [4]
 The test for whether a counterclaim by the bankrupt or its trustee is compulsory is the same as that of Rule 13(a), Fed.R.Civ.P. 1 Collier on Bankruptcy p 2.40[1.1] (14th ed. 1974)
 
 
 [5]
 There is no question but that the bankruptcy referee lacked both the life tenure "good Behaviour" and the irreducible salary "Compensation Clause" attributes of an Article III federal judge. See generally Note, Article III Limits on Article I Courts: The Constitutionality of the Bankruptcy Court and the 1979 Magistrate Act, 80 Colum.L.Rev. 560, 582-87 (1980)
 
 
 [6]
 As an action pre-existing the October 1, 1979, effective date of the Bankruptcy Reform Act of 1978, P.L. 95-598, 92 Stat. 2549, the prior Bankruptcy Act of 1898 and applicable rules govern the proceedings. Sec. 403(a), Bankruptcy Reform Act of 1978, 11 U.S.C. prec. Sec. 101 (1979); Central Trust Co. v. Officials Creditors' Committee of Geiger Enterprises, Inc., 454 U.S. 354, 102 S.Ct. 695, 70 L.Ed.2d 542 (1982)
 
 
 [7]
 Except, as already noted, with regard to dismissal of its statutory warranty claims. See infra note 10
 
 
 [8]
 The "clearly erroneous" standard has been carried over into the 1978 Bankruptcy Act in practice, although not expressly adopted in that statute. Northern Pipeline Construction Co. v. Marathon Pipeline Co., --- U.S. ----, 102 S.Ct. 2858, 2863 n. 5, 73 L.Ed.2d 598 (1982); see also 1 Collier on Bankruptcy p 3.03[b] (15th ed. 1982)
 
 
 [9]
 The district court opinion and order here were issued February 17, 1982, while Marathon Pipeline was not announced until June 28, 1982
 
 
 [10]
 Reminc has combined claims under Virginia's Commercial Code warranty provisions, 2A Code of Virginia Secs. 8.2-314 and 8.2-315, with its common law claims. We have no need to consider whether these code claims, as modern statutory ones, would also implicate a "clearly erroneous" limitation on review, as the Commercial Code does not encompass Reminc's allegations. The HVAC system was hardly "movable", 2A Code of Virginia Sec. 8.2-105, and we see no merit in separating the contract into severable ones for each movable part that went into producing the whole contracted for by Reminc. Cf. Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co., 532 F.2d 572, 580 (7 Cir.1976). Those counts therefore were properly dismissed
 
 
 [11]
 Justice White in his Marathon Pipeline dissent elaborated at length on the broad powers of the referee even under the 1898 Act, and noted especially the continuity of the "clearly erroneous" standard from the old to the new Bankruptcy Act. --- U.S. at ----, 102 S.Ct. at 2887. This observation does not imply that the vesting of adjudicatory powers in a non-Article III judge becomes inherently violative of separation of powers notions whenever a rule such as Rule 810 governs appellate review. On the contrary, it only points up that where the claim adjudicated is one that by its nature can only be heard by an Article III judge in the federal system, the differing features of the various Bankruptcy Acts do not provide a sound basis for distinction upon which to uphold limited review
 
 
 [12]
 Justice White's dissent in Marathon Pipeline warned against adoption of a principle that would "overrule a large number of our precedents upholding a variety of Article I courts--not to speak of those Article I courts that go by the contemporary name of 'administrative agencies' ". --- U.S. at ----, 102 S.Ct. at 2893. Concluding that there is no "abstract principle" dividing the types of issues that may be adjudicated by Article III as opposed to Article I courts, Justice White in the end advocated reading Article III "as expressing one value that must be balanced against competing constitutional values and legislative responsibilities. This Court retains the final word on how that balance is to be struck." Id. To this extent all Justices writing in Marathon agreed that there is an abiding limit on "the work that Congress may assign to an Article I court." Id. Cf. Tribe, American Constitutional Law, Sec. 3-5 at 43-44 (1978)
 
 
 [13]
 See, e.g., Sec. 706 of the Administrative Procedure Act, 5 U.S.C. Sec. 706; Sec. 205(h) of the Social Security Act, 42 U.S.C. Sec. 405(h). This deferential review generally accompanies those matters classified as involving "public rights" in the categorization scheme set out in Marathon Pipeline, supra, --- U.S. at ----, 102 S.Ct. at 2869. It does not necessarily follow that as "public rights" permissibly adjudicated in the first instance by non-Article III bodies, such matters may be placed by Congress altogether outside the purview of Article III courts. See The Supreme Court, 1981 Term, 96 Harv.L.Rev. 62, 262-65; Atlas Roofing, supra, 430 U.S. at 455 n. 13, 97 S.Ct. at 1269 n. 13; Marathon Pipeline, supra, --- U.S. at ---- n. 23, 102 S.Ct. at 2870 n. 23
 
 
 [14]
 We do not construe the seeking of protection in a bankruptcy proceeding as an implied consent to trial by an otherwise unconstitutional tribunal, lest we move towards condonation of unconstitutional conditions on access to a federal forum
 
 
 [15]
 Although we have concluded that Marathon Pipeline cannot by its terms be directly controlling of this case, we nonetheless take guidance from its authoritative elaboration of the issues involved. In distilling the specific holding of Marathon Pipeline to the kernel principle quoted in the text, we believe Chief Justice Burger enunciated a statement of Article III jurisprudence that resolves many of the competing constitutional interests drawn into Reminc's challenge to Rule 810. In finding this principle ultimately primary in this case, we do not intimate any view as to the resolution of an abstractly similar challenge in a different context
 
 
 [16]
 Exceptional circumstances may occasionally warrant non-application to the case at hand, such as in McFaddon, where the court raised the novel jurisdictional issue sua sponte. 415 F.2d at 1102
 
 
 [17]
 Effective with the Supreme Court's refusal to stay its decision in Marathon beyond December 24, 1982, the Circuit Council promulgated an order requiring the district courts of this circuit to adopt a local rule in the form prescribed in the order. See Circuit Council Order No. 3 (December 20, 1982). Sec. (e)(2)(B) of that order provides:
 In conducting review, the district judge may hold a hearing and may receive such evidence as appropriate and may accept, reject, or modify in whole or in part the order or judgment of the bankruptcy judge and need give no deference to the findings of the bankruptcy judge. At the conclusion of the review, the district judge shall enter an appropriate order or judgment.