# United States Court of Appeals for the Federal Circuit

_____

**NINESTAR TECHNOLOGY CO., LTD., NINESTAR TECHNOLOGY COMPANY, LTD., AND TOWN SKY, INC.,**
*Appellants,*

v.

**INTERNATIONAL TRADE COMMISSION,**
*Appellee,*

AND

**EPSON PORTLAND INC., EPSON AMERICAN, INC., AND SEIKO EPSON CORPORATION,**
*Intervenors.*

_____

2009-1549

_____

Appeal from the United States International Trade Commission in Investigation No. 337-TA-565.

_____

Decided: February 8, 2012

_____

EDWARD F. O'CONNOR, The Eclipse Group, LLP, of Irvine, California, for appellants. With him on the brief was STEPHEN M. LOBBIN.

WAYNE W. HERRINGTON, Assistant General Counsel, Office of the General Counsel, United States International Trade Commission, of Washington, DC, for appellee. With him on the brief were JAMES M. LYONS, General Counsel, and MICHAEL K. HALDENSTEIN, Attorney. Of counsel was ANDREA C. CASSON, United States International Trade Commission, of Washington, DC.

HAROLD A. BARZA, Quinn Emanuel Urquhart Oliver, of Los Angeles, California, for intervenors. With him on the brief were TIGRAN GULEDJIAN and VALERIE RODDY; and SANFORD I. WEISBURST, of New York, New York. Of counsel on the brief were LOUIS S. MASTRIANI and MICHAEL L. DOANE, Adduci, Mastriani & Schaumberg, LLP, of Washington, DC.

———————————

Before NEWMAN, SCHALL, and LINN, *Circuit Judges.*

NEWMAN, *Circuit Judge.*

This appeal is taken from the Order of the United States International Trade Commission assessing a civil penalty against the Ninestar companies for failure to comply with exclusion and cease and desist orders arising from violation of Section 337 of the Tariff Act, 19 U.S.C. §1337. We affirm the Commission's rulings.

## BACKGROUND

In the foundation action under Section 337, the Commission had found unfair trade practices based on infringement of certain United States patents by the importation and sale of ink printer cartridges produced in China by Ninestar Technology Co., Ltd. ("Ninestar China") and imported into and sold in the United States by various entities including Ninestar's wholly owned United States subsidiar-

ies, Ninestar Technology Company, Ltd. ("Ninestar U.S.") and Town Sky, Inc. ("Town Sky") (the three Ninestar companies collectively "Ninestar" unless specifically designated). The Commission ruled that the ink printer cartridges infringed United States patents owned by or exclusively licensed to Epson America, Inc., Epson Portland Inc., and Seiko Epson Corporation (collectively "Epson"), and issued a general exclusion order, limited exclusion orders, and cease and desist orders. *Certain Ink Cartridges and Components Thereof*, Inv. No. 337-TA-565, USITC Pub. 4195 (Oct. 19, 2007) (Final Orders); 72 Fed. Reg. 60,692 (Oct. 25, 2007) (Notice). The Federal Circuit affirmed. *Ninestar Tech. Co. v. U.S. Int'l Trade Comm'n*, No. 2008-1201, 309 F. App'x 388 (Fed. Cir. Jan. 13, 2009).

The Final Orders prohibited importation and sale of infringing cartridges, including imported cartridges in the inventory of Ninestar's United States subsidiaries and other respondents. The Orders were directed to each Respondent:

> IT IS HEREBY ORDERED THAT Nine Star Technology Company Ltd., 4620 Mission Boulevard, Montclair, California 91763, cease and desist from conducting any of the following activities in the United States: importing, selling, marketing, advertising, distributing, offering for sale, transferring (except for exportation), and soliciting U.S. agents or distributors for, ink cartridges that are covered by one or more of claim 7 of U.S. Patent No. 5,615,957 ("the '957 patent"); claims 18, 81, 93, 149, and 164 of U.S. Patent No. 5,622,439 ("the '439 patent"); claims 83 and 84 of U.S. Patent No. 5,185,377 ("the '377 patent"); claims 19 and 20 of U.S. Patent No. 5,221,148 ("the '148 patent"); claim 1 of U.S. Patent No. 5,488,401 ("the '401 patent"); claims 1, 2, 3 and 9 of U.S. Patent No. 6,502,917 ("the '917 pat-

ent"); claims 1, 31, and 34 of U.S. Patent No. 6,550,902 ("the '902 patent"); claims 1, 10, and 14 of U.S. Patent No. 6,955,422 ("the '422 patent"); claim 1 of U.S. Patent No. 7,008,053 ("the '053 patent"), in violation of section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337.

Final Orders at *121 (Cease and Desist Order). A separate, identical Order was directed to Town Sky, Inc. *Id.* at *137. Each Order states:

> The provisions of this Cease and Desist Order shall apply to Respondent and any of its principals, stockholders, officers, directors, employees, agents, licensees, distributors, controlled (whether by stock or ownership) and majority-owned business entities, successors, and assigns, and to each of them, insofar as they are engaging in conduct prohibited by Section III, *infra,* for, with, or otherwise on behalf of Respondent.

*Id.* at *123, *139.

After issuance of the Commission's exclusion and cease and desist orders, Ninestar U.S. and Town Sky continued to import into the United States and to sell the ink cartridges that were the subject of the orders. An enforcement proceeding was brought and, upon investigation and hearing, the Administrative Law Judge determined that Ninestar was in violation of the orders, and levied a civil penalty in accordance with 19 U.S.C. §1337(f)(2). *Certain Ink Cartridges and Components Thereof*, Inv. No. 337-TA-565, USITC Pub. 4196 (Apr. 17, 2009) (Enforcement Initial Det'n or "EID"). The full Commission adopted the findings and conclusions of the EID, but reduced the penalty by about half. *Certain Ink Cartridges and Components Thereof*, Inv.

No. 337-TA-565, USITC Pub. 4196 (August 17, 2009) (Final Det'n); 74 Fed. Reg. 42,325 (Aug. 21, 2009). Ninestar appeals the assessment of the penalty and its amount. Ninestar also objects to the inclusion of Ninestar China as jointly and severally liable for the penalty along with the Ninestar United States subsidiaries.

## DISCUSSION

Ninestar argues that the International Trade Commission incorrectly found infringement by the Ninestar products, that the authority exercised by the Commission to exclude these products and to enforce its orders is in violation of the constitutional principles of separation of powers, and that the proceedings violated Ninestar's constitutional rights to notice, clarity, and a jury trial.

As provided in 19 U.S.C. §1337(c), rulings of the International Trade Commission are reviewed in accordance with the Administrative Procedure Act, 5 U.S.C. §706(2). Findings of fact are reviewed to determine whether they are supported by substantial evidence, *e.g., GemStar-TV Guide Int'l, Inc. v. U.S. Int'l Trade Comm'n*, 383 F.3d 1352, 1360 (Fed. Cir. 2004), and legal conclusions receive plenary review, *e.g., Bourdeau Bros. v. U.S. Int'l Trade Comm'n*, 444 F.3d 1317, 1320 (Fed. Cir. 2006). Assessment of a civil penalty under 19 U.S.C. §1337(f) is reviewed on the standard of abuse of discretion, *e.g., Genentech, Inc. v. U.S. Int'l Trade Comm'n*, 122 F.3d 1409, 1414 (Fed. Cir. 1997).

## I

## VIOLATION OF THE COMMISSION'S ORDERS

At the enforcement hearing, executives of the Ninestar United States subsidiaries testified, upon subpoena, that

they continued to import and sell the ink cartridges produced by Ninestar China, with knowledge that the cartridges had been held by the Commission to infringe United States patents and were subject to the Commission's exclusion and cease and desist orders. The Ninestar executives acknowledged, and the evidence showed, imports and sales after issuance of the Commission's orders. The evidence also showed manipulation of transaction dates, and misdescriptions of the cartridges as compatible or remanufactured.[1] The Ninestar executives acknowledged that they filed false affidavits of compliance during the period after issuance of the cease and desist orders. The ALJ, on an extensive evidentiary record, found that Ninestar had deliberately and in bad faith violated the exclusion and cease and desist orders. The Commission adopted the ALJ's findings and conclusions, describing the violations of the Commission's orders as "egregious." Final Det'n 44.

On this appeal Ninestar does not deny its actions and its knowledge that it was not in compliance with the Commission's orders, but argues that it was justified in noncompliance because the law applied by the Commission is wrong. Ninestar states that the correct law is that the manufacture and sale of a product in any country "extinguishes all patent rights, regardless of the physical location where the sales occur." Ninestar Br. 4. Ninestar states that national patent rights are exhausted by the manufacture and sale in a foreign country of a product covered by a national patent, and thus the importation of that product cannot violate the national patent. Thus Ninestar states that the sale in a foreign country of a product manufactured

---

[1] "Compatible" cartridges are new ink cartridges produced by Ninestar China for use in Epson printers; "remanufactured" cartridges ("remans") are genuine used Epson cartridges that were reprocessed by Ninestar China. Final Det'n 6.

in the foreign country extinguishes any right to enforce a United States patent against that product if it is imported into the United States. Ninestar argues that since the law on which the Commission relied is incorrect, no penalty should be imposed for Ninestar's violation of orders based on law that Ninestar, in good faith, believed was incorrect. Ninestar Br. 43–44.

Ninestar focuses on the ruling in *Jazz Photo Corp. v. U.S. Int'l Trade Comm'n*, 264 F.3d 1094 (Fed. Cir. 2001), where this court held that United States patents are not exhausted as to products that are manufactured and sold in a foreign country, and that importation of such products may violate United States patents. As stated in *Jazz Photo,* "United States patent rights are not exhausted by products of foreign provenance. To invoke the protection of the first sale doctrine, the authorized first sale must have occurred under the United States patent." 264 F.3d at 1105. Ninestar states that this case and the precedent on which it relied were incorrectly decided, and were overruled by the Supreme Court in *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 632 n.6 (2008). However, neither the facts nor the law in *Quanta Computer* concerned the issue of importation into the United States of a product not made or sold under a United States patent. In *Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1371 (Fed. Cir. 2010), the court remarked that "*Quanta Computer, Inc. v. LG Electronics, Inc.* did not eliminate the first sale rule's territoriality requirement." The patents, products, and methods in *Quanta Computer* all concerned products manufactured and first sold in the United States, and the Court held that method patents as well as product patents are subject to exhaustion upon sale of product or components in the United States. Ninestar does not dispute Epson's statement that the vast majority of Ninestar's remanufactured Epson cartridges were of Asian or European origin, although Ninestar does argue that it

was Epson's burden to establish the provenance of each cartridge imported by Ninestar. Ninestar also states that "repair/reconstruction was never an issue in the case." Ninestar Rep. Br. 10.

The evidence, including testimony of Ninestar executives as well as Ninestar's actions in attempted avoidance, showed that Ninestar understood the law and the Commission's orders. Indeed, in its prehearing statement Ninestar stated: "Admittedly, a patent attorney would and should know that refurbishing and reselling of spent cartridges, which were not first sold in the United States, would be patent infringement." Statement at 5 (Dec. 11, 2008). Ninestar did not dispute that the ink cartridges that it imported and the inventory that it sold after issuance of the Commission's orders are the same technological products as the cartridges whose importation and sale were found to be infringing and were prohibited by the Commission.

The Commission's ruling that its orders were violated with knowledge and in bad faith is supported by substantial evidence and is in accordance with law, and is affirmed.

## II

## THE STATUTORY PENALTY

The Tariff Act sets a civil penalty for violation of an order of the Commission, as follows:

> 19 U.S.C. §1337(f)(2)  Any person who violates an order issued by the Commission . . . shall forfeit and pay to the United States a civil penalty for each day on which an importation of articles, or their sale, occurs in violation of the order of not more than the greater of $100,000 or twice the domestic value of

the articles entered or sold on such day in violation of the order. . . .

Ninestar argues that there should be no penalty in view of Ninestar's good faith belief that the Commission's orders were based on incorrect law, and also that the Commission proceedings violate the Constitution in several respects. The Commission's penalty ruling is reviewed on the standard of abuse of discretion, to determine if the decision "(1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact findings; or (4) follows from a record that contains no evidence on which the decision-making body could rationally base its decision." *Genentech*, 122 F.3d at 1415.

## A.  Factors Considered

In considering the penalty for violation of the Commission's orders, the ALJ and the full Commission applied the factors summarized in *San Huan Materials High Tech, Inc. v. International Trade Commission*, 161 F.3d 1347, 1362 (Fed. Cir. 1998), *viz.*, (1) the good or bad faith of the respondent; (2) any injury due to the infringement; (3) the respondent's ability to pay the assessed penalty; (4) the extent to which the respondent benefitted from its violations; (5) the need to vindicate the authority of the Commission; and (6) the public interest.  Final Det'n 17–18.

In determining whether there was good or bad faith, the Commission applied the criteria in *Certain Erasable Programmable Read Only Memories (EPROMs)*, Inv. No. 337-TA-276, 1991 ITC LEXIS 1311, at *45 (Aug. 1, 1991) and *Certain Agricultural Tractors Under 50 Power Take-Off Horsepower*, Inv. No. 337-TA-380, 1999 ITC LEXIS 260, at *87, *99 (Aug. 18, 1999).  The ALJ pointed to Ninestar's false compliance statements, under oath, that they "believe

that substantially all of such cartridges were of U.S. origin and therefore not covered products." EID 80. This belief was contravened by the testimony at the hearing, where Ninestar U.S. vice president William Dai testified:

Q. Sir, when you signed this compliance statement, you did not believe that substantially all of the re-manufactured cartridges which Ninestar U.S. had imported or sold in the United States after the date of the cease and desist order were of U.S. origin and, therefore, not covered products, isn't that true?

A. No, what I said just now was I didn't know -- or I don't know.

Q. Don't know what?

A. I mean, I didn't know where the empties used for producing the remans came from, that I didn't know.

*Id.*

The Commission found that Ninestar continued the importation and sales of the infringing ink cartridges with knowledge that the products were the subject of exclusion and cease and desist orders, that Ninestar "deliberately evaded" the Commission's orders, and that "[t]he record is replete with evidence of bad faith." Final Det'n 24, 35.

The ALJ based the sanction assessment on Ninestar United States subsidiaries' electronic records between October 23, 2007 (four days after issuance of the cease and desist orders) and May 5, 2008. These records showed that

the infringing products were imported on fifteen days and sold on 187 days. The ALJ did not count records from other sources, such as customers, that showed additional sales not in the subsidiaries' electronic records. The ALJ found that the importation and sales were made in deliberate and knowing violation of the Commission's orders, and levied the maximum statutory penalty of $100,000 per day. EID 122–24.

The full Commission, while remarking on the "egregious" bad faith of the violations, reduced the penalty to $55,000 per day, stating that the reduced amount was commensurate with the sales violations and the lost sales of Epson, and the bond that should have been posted during the Presidential review period. Final Det'n 44–45. The Commission stated that "[t]he combined penalty of $11,110,000 should be sufficient to deter future violations by the Ninestar Respondents and others considering violating the Commission's orders." *Id.* The Commission observed that Ninestar has "the ability to pay substantial penalties" and that Ninestar "did not introduce accounting records or demonstrate any reason why the maximum penalties should not be imposed." Final Det'n 31.

The Commission points to Ninestar's knowledge of its violation and the fraudulent actions taken to evade compliance. The Commission referred to the harm to domestic industry due to the magnitude of the infringing operations. The Commission found the amount of the penalty to be comparable to the lost sales to the patentee, found to exceed nine million dollars. Final Det'n 45. The Commission points out that the statutory penalty is designed to serve as a deterrent, because "[t]he public interest is not served if intellectual property rights are not respected, and the imposition of a penalty that is substantial enough to deter future violations is in the public interest." Final Det'n 38.

If the only consequence of ignoring the Commission's orders were payment of a modest fee if caught, the statutory purpose of deterring unfair trade practices would fail, for the Commission has no other remedy.

The Commission's penalty was within the Commission's authority, and in accordance with the legislative purpose. Abuse of discretion has not been shown in the imposition of a penalty and its amount.

## B. Joint and Several Liability

The Commission ordered that "[a]ll three of the Ninestar Respondents, Ninestar Technology Co., Ninestar Technology Company, Ltd., Town Sky Inc., shall have joint and several liability for the payment of the total amount of these civil penalties." *Certain Ink Cartridges and Components Thereof,* Inv. No. 337-TA-565, USITC Pub. 4196 (Aug. 18, 2009) (Comm'n Order). The Commission adopted the ALJ's determination that the text of the limited exclusion order, which identifies both subsidiaries Ninestar U.S. and Town Sky, and "any of its principals, stockholders, officers, directors, employees, agents, licensees, distributors, controlled (whether by stock or ownership) and majority-owned business entities, successors, and assigns" makes "Ninestar China, the subsidiaries' principal and sole owner, liable for violating the Cease and Desist Orders, whether directly, through its own actions, or through its control over the violations of the two subsidiaries, under basic agency principles," EID 18. Final Det'n 52–53.

Ninestar argues that the penalty cannot be levied against Ninestar China, but only against the United States subsidiaries. Ninestar states that it is "elementary and well established law that a parent is not liable for the actions of its subsidiary, even if there are overlapping directors or

officers." Ninestar Br. 27 (citing *United States v. Bestfoods*, 524 U.S. 51, 61–62 (1998) for the rule that a parent corporation and its subsidiaries are separate legal entities and that the parent is not liable for acts or obligations of the subsidiary). Ninestar argues that the Commission did not prove that Ninestar China controlled the activities of its United States subsidiaries and that the burden of proof was with the Commission. Ninestar points to the testimony of its executives that the United States subsidiaries operated independently of the parent in China. Ninestar states that the Commission does not have jurisdiction over Ninestar China and that the United States subsidiaries do not have the resources to pay the penalty.

The Commission found that Ninestar China monitored and controlled the actions of its United States subsidiaries, that regular reports were made of sales, inventories, and returns, and that the profits of the infringing sales were regularly sent to Ninestar China.

The Commission found that Ninestar China exercised control over the United States subsidiaries for the benefit of Ninestar China, and that although Ninestar China was a participant in the Commission's proceedings and a recipient of the judgment and enforcement orders, Ninestar China did not order its subsidiaries to terminate importation and sales, but instead was complicit in violation of the orders, including providing to its subsidiaries the false affidavits of compliance. The Commission states that *Best Foods* "fully support[s] imposition of joint and several liability" because *Best Foods* "indicates that an owner of a corporation may be held liable for the subsidiary's conduct when 'the corporate form would otherwise be misused to accomplish certain wrongful purposes . . . on the shareholder's behalf.'" Final Det'n 53 (quoting *Bestfoods*, 524 U.S. at 62).

Ninestar also argues that Ninestar China cannot be liable for the penalty because it is a foreign entity and not within the Commission's jurisdiction. The Commission responds that Ninestar China waived any issue of jurisdiction because "it was a party that participated fully in the enforcement proceedings and the underlying investigation." Comm'n Br. 42 n.10. The Commission points out that Ninestar China participated actively in trade with the United States as the owner of the United States subsidiaries that import and sell its products and that remit all profits to the parent company in China.

The record contains substantial evidence to support the Commission's finding that "Ninestar China knew of the cease and desist orders and was in a position to ensure compliance with the cease and desist orders, yet it continued to supply covered products to its subsidiaries rather than directing compliance with the orders." Final Det'n 52; *cf. Fuji Photo Film Co. v. Int'l Trade Comm'n*, 474 F.3d 1281, 1293 (Fed. Cir. 2007) (affirming liability of the foreign shareholder as "legally identified with [the respondent] and had the power to affect compliance with the Cease and Desist Order"); *San Huan Materials*, 161 F.3d at 1347 n.2 (confirming joint and several liability of foreign provider and United States importer of infringing goods).

The Commission's assessment of joint and several liability of the three Ninestar entities is commensurate with the evidence of control, commercial relationships, monetary flow, and knowing violation of the Commission's orders. The assessment is affirmed.

## C. Ninestar's Constitutional Arguments

The Commission states that Ninestar waived any constitutional arguments, for they were not presented during

the enforcement proceeding. Ninestar responds that constitutional issues were not raised to the Commission because the Commission has no authority to declare its governing statute unconstitutional. Although we agree that these issues are tardily raised, constitutional challenges should not be deemed waived when they relate to the foundations of governmental process. Courts of appeal have the discretion to consider issues not raised below "as justice may require," *Hormel v. Helvering*, 312 U.S. 552, 555–59 (1941); and waiver is inapplicable to "significant questions of general impact or of great public concern," *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1345 (Fed. Cir. 2001). *See Singleton v. Wulff*, 428 U.S. 106, 121 (1976) (Waiver is not jurisdictional but a prudential concern "left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases."). Thus we have considered Ninestar's constitutional arguments.

1.

Ninestar argues that a non-judicial body cannot be assigned authority to issue a punitive penalty for violation of an administrative order. Ninestar argues that the statutory penalty is of such magnitude as to be criminal in nature and that a procedure whereby an administrative agency levies a criminal penalty is an unconstitutional violation of separation of powers. Ninestar states that before a penalty of the magnitude authorized in Section 337(f) can be imposed, Ninestar must be tried in an Article III court with the safeguards to which criminal defendants are entitled, including the right not to provide adverse testimony and entitlement to proof beyond a reasonable doubt. Ninestar cites *United Mine Workers v. Bagwell*, 512 U.S. 821 (1994), in which the Court stated that a monetary penalty is akin to "criminal contempt," for in cases "[w]here a fine is not compensatory, it is civil only if the contemnor is afforded an

opportunity to purge." *Id.* at 829. In *Bagwell* the Court held that a contempt fine of $52 million against the United Mine Workers for violation of a labor injunction was criminal in nature and required a jury trial. *See also United States v. Dixon*, 509 U.S. 688, 696 (1993) (holding that constitutional protections afforded criminal defendants through the Sixth Amendment apply in nonsummary criminal contempt prosecutions just as they do in other criminal prosecutions).

In *Hudson v. United States*, 522 U.S. 93, 99 (1997) the Court explained that "whether a particular punishment is criminal or civil is . . . a matter of statutory construction," citing *Helvering v. Mitchell,* 303 U.S. 391, 399 (1938), and that a court must ascertain whether the legislature, "in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other," citing *United States v. Ward,* 448 U.S. 242, 248 (1980). The Court elaborated:

> Even in those cases where the legislature "has indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect," *Ward*, 448 U.S. at 248–49, as to "transfor[m] what was clearly intended as a civil remedy into a criminal penalty," *Rex Trailer Co. v. United States*, 350 U.S. 148, 154 (1956).

*Hudson*, 522 U.S. at 99.

Ninestar draws analogy to the criminal statutes of the Internal Revenue Service, where criminal penalties against individuals require litigation in federal district court with the right to a jury trial, citing 26 U.S.C. §§7401–7402. Ninestar also relies on the Seventh Amendment and cites

the Securities and Exchange Commission civil penalty provisions of 15 U.S.C. §§78u(d)(3), 78aa and the Federal Trade Commission civil penalty provisions of 15 U.S.C. §45(m) as establishing that only the district courts, not the administrative agencies, have authority to assess a civil penalty. Ninestar Reply Br. 3. Thus Ninestar argues that the International Trade Commission does not have constitutional authority to levy and enforce the civil penalty of Section 337(f). Ninestar states that it is entitled to a jury trial, by constitutional right and Supreme Court precedent, and that since a jury trial is impossible in a Commission proceeding, "the entire congressional scheme is invalid." Ninestar Br. 49. Ninestar calls the International Trade Commission statute "an unconstitutional monstrosity," Br. 47, and urges that "[t]his court should strike down the ability of the ITC to impose financial punishments on those who violate their orders," Br. 50.

The Commission responds that it is beyond challenge that administrative agencies may by legislation be assigned the authority to impose penalties or sanctions for violation of their rulings and orders, citing the monetary penalties routinely imposed by the Internal Revenue Service. The Court in *Ward*, *supra*, listed various criteria relevant to the objective evaluation of a legislated civil penalty, including:

> [w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment-retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and

whether it appears excessive in relation to the alternative purpose assigned.

*Ward*, 448 U.S. at 248 n.7 (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)). The Court cautioned, however, that "these factors must be considered in relation to the statute on its face." *Mendoza-Martinez*, 372 U.S. at 168. The Court advises that "only the clearest proof" will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty. *Ward*, 448 U.S. at 249. We do not discern such proof in this case.

There is no issue here of criminal contempt or double jeopardy, as existed in *Hudson*, or of a fine that is highly disproportionate to the monetary value of the offense, as in *Bagwell*. In considering Seventh Amendment rights in the context of the administrative state, in *Atlas Roofing Co. v. Occupational Safety & Health Review Commission*, 430 U.S. 442 (1977) the Court explained:

> [W]hen Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment's injunction that jury trial is to be 'preserved' in 'suits at common law.' . . . This is the case even if the Seventh Amendment would have required a jury where the adjudication of those rights is assigned instead to a federal court of law instead of an administrative agency.

*Id.* at 455. International Trade Commission proceedings are within this category, for Congress "created a new cause of action, and remedies therefor, unknown to the common law, and placed their enforcement in a tribunal supplying speedy

and expert resolutions of the issues involved. The Seventh Amendment is no bar to the creation of new rights or to their enforcement outside the regular courts of law." *Id.* at 460–61.

The jury aspect of administrative processes was again discussed in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 55 n.10 (1989): "Those cases in which Congress may decline to provide jury trials are ones involving statutory rights that are integral parts of a public regulatory scheme and whose adjudication Congress has assigned to an administrative agency or specialized court of equity." *See Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1488 (Fed. Cir. 1986) (stating that "[a]lthough it is true that private rights may be affected by section 337 determinations, the thrust of the statute is directed toward the protection of the public interest from unfair trade practices in international commerce").

Section 337 proceedings are integral to the control of unfair competition in trade, and the provision of a civil penalty is within regulatory authority and is appropriately assigned to the administrative agency.

2.

Ninestar also argues that the Commission's cease and desist order is "unconstitutional on its face" because it is "unclear" in that it does not identify the specific ink cartridges and model numbers that are affected. Ninestar Br. 22. The Commission responds that the affected products were before the ALJ and the full Commission and were known to Ninestar, and that Ninestar witnesses conceded that no change was made in the products after the Commission's order. The Commission directs attention to its procedure for obtaining an "advisory opinion" if an order is unclear or if a product is changed:

> 19 C.F.R. §210.79. Upon request of any person, the Commission may . . . issue an advisory opinion as to whether any person's proposed course of action or conduct would violate a Commission exclusion order, cease and desist order, or consent order.

Ninestar did not invoke this procedure or otherwise request clarification, or suggest a modified course of action. The Commission found that "the Ninestar Respondents knew that their conduct was prohibited," Final Det'n 17, and that Ninestar "did not simply ignore or disregard the Commission's orders; they deliberately evaded the orders," Final Det'n 35. These findings were supported by substantial evidence.

It is also relevant that decisions of the Commission are subject to judicial review, as a safeguard against administrative excess. We discern no violation of constitutional structure in the Commission's authority to levy a civil penalty, and no violation of constitutional protections in the procedures followed and the penalty assessed.

CONCLUSION

The Commission's rulings are affirmed.

**AFFIRMED**