# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 20, 2026

Lyle W. Cayce
Clerk

―――――――――

No. 24-60040

―――――――――

Intuit, Incorporated,

*Petitioner*,

*versus*

Federal Trade Commission,

*Respondent*.

―――――――――――――――――――――――

Petition for Review from the Federal Trade Commission
Agency No. 9408

―――――――――――――――――――――――

Before Jones, Barksdale, and Ho, *Circuit Judges*.

Edith H. Jones, *Circuit Judge*:

The Federal Trade Commission ("FTC") is authorized by Section 5 of the FTC Act to prosecute "unfair or deceptive acts or practices" involving interstate commerce. 15 U.S.C. § 45(a)(1). Affirming an administrative law judge ("ALJ"), the FTC imposed a cease-and-desist order on Intuit, Inc., for "deceptive" advertisements that one of its popular TurboTax preparation products is "free" for "simple tax returns." Following the Supreme Court's decision in *SEC v. Jarkesy*,[1] we hold that

―――――――――――――――――

[1] 603 U.S. 109, 144 S. Ct. 2117 (2024).

adjudication of a deceptive advertising claim before an administrative law judge violated the constitutional separation of powers. Intuit's petition for review is GRANTED; the FTC's order is VACATED; and the case is REMANDED to the agency for further proceedings.

## I. BACKGROUND

Petitioner Intuit, Inc. sells "TurboTax," a popular line of online and desktop tax-preparation products. TurboTax "Free Edition" has been part of the TurboTax range for more than a decade, available to taxpayers for what Intuit refers to as "simple tax returns." Most American taxpayers do not have "simple tax returns." Intuit has expanded access to the TurboTax Free Edition over time, but "simple tax returns" has previously excluded taxpayers with mortgage and property deductions, itemized deductions, unemployment income, education expenses, charitable donations above a certain threshold, investment or rental property income, and expenses from self-owned businesses. The TurboTax website is designed so that any individual taxpayer can begin preparing a tax return in TurboTax Free Edition, but those who enter disqualifying information are prompted before filing to upgrade to a paid product.

Intuit advertised TurboTax Free Edition across a variety of popular, accessible media. These advertisements typically drew attention to the fact that TurboTax Free Edition does not cost anything, although Intuit usually added disclosures that state the TurboTax Free Edition is limited to taxpayers with "simple tax returns," "simple U.S. returns," or similar verbiage.

In 2022, FTC issued an administrative complaint alleging that TurboTax Free Edition advertisements deceived consumers into believing that all TurboTax products are free. These allegations were predicated on Section 5 of the FTC Act, which proscribes "unfair or deceptive acts or

2

No. 24-60040

practices." 15 U.S.C. § 45(a)(1).[2]  The Commission initially filed suit in the Northern District of California and moved for a preliminary injunction against Intuit, which was denied.  FTC then changed course, abandoned the federal suit, and pursued a cease-and-desist order by means of internal adjudication.  An ALJ presided over the adjudication and issued a decision concluding that Intuit's advertisements were likely to mislead a significant minority of consumers.  On appeal by Intuit, three Commissioners affirmed in an opinion largely tracking the ALJ's decision.  The cease-and-desist order is remarkably broad: it prohibits Intuit for the next twenty years from advertising "any goods or services" as free unless specific, extensive, and arguably unworkable requirements are satisfied.  The order is not confined to tax-preparation solutions and extends to all products sold by Intuit.[3]

## II. DISCUSSION

Intuit petitions for review under 15 U.S.C. § 45(c) and raises a variety of arguments.[4]  The threshold argument that FTC unlawfully adjudicated

---

[2] This case does not consider any unfair competition claims under the FTC Act other than claims for deceptive advertising.  15 U.S.C. § 45(a)(1) ("Unfair methods of competition in or affecting commerce . . . are hereby declared unlawful.").

[3] Intuit's numerous products include (but are not limited to) several individual tax preparation software programs, professional tax programs, credit score reporting software, and an email marketing program.

[4] The arguments fall into three categories.  First, Intuit contends that the agency proceeding was unlawful because deceptive advertising claims involve "private rights"; removal protections for FTC commissioners violate the Constitution; agency discretion to adjudicate claims internally or in court violates the nondelegation doctrine; the combination of prosecutorial and adjudicative functions in a single government agency violates due process; and due process required then-Chair Lina Kahn to recuse.  Second, Intuit assails FTC's decision for insufficient evidence, applying a stricter deception standard than appropriate, analyzing TurboTax ads in a piecemeal manner, and holding that various TurboTax website disclosures could not cure consumer deception.  Third, Intuit contends that the cease-and-desist order is unlawful because it was unnecessary,

No. 24-60040

"private rights" before an ALJ rather than in an Article III court proves dispositive. The Commission rejected that argument, and our review is de novo. *See Emp. Sols. Staffing Grp. II, LLC v. Off. of Chief Admin. Hearing Officer*, 833 F.3d 480, 484 (5th Cir. 2016).

## A.

Because the Supreme Court's decision in *Jarkesy* undertook a careful survey of authorities bearing on the constitutional status of administrative agency adjudication, an abridged account suffices. The Constitution exclusively vests the "judicial Power of the United States . . . in one Supreme Court, and in such inferior courts as the Congress may . . . establish." U.S. CONST. Art. III, § 1. Accordingly, Congress may not "confer the Government's 'judicial Power' on entities outside Article III." *Stern v. Marshall*, 564 U.S. 462, 484, 131 S. Ct. 2594, 2609 (2011). The Constitution also fixes the scope of the judicial power, as it "shall extend to all Cases, in Law and Equity, arising under this Constitution, [and] the Laws of the United States." U.S. CONST. Art. III, § 2, cl. 1. Whether a given claim falls within that scope turns on a longstanding distinction between "public rights" and "private rights." *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 32, 134 S. Ct. 2165, 2171 (2014).

## 1.

The Supreme Court has explained that private rights are implicated by "any [claim] which, *from its nature*, is the *subject of a suit* at the *common law*, *or in equity*, or admiralty." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 284 (1856) (emphases added). Courts often ask whether a claim "is made of the stuff of the traditional

---

overbroad, vague, and arbitrary and capricious. Intuit concedes that several of its arguments are foreclosed by binding precedent.

actions at common law tried by the courts at Westminster in 1789," although Article III extends beyond strictly "legal" actions. *Stern*, 564 U.S. at 484, 131 S. Ct. at 2609 (internal quotations and citation omitted). Claims that are naturally "the subject of a suit at the common law, or in equity," implicate private rights and thus fall under federal jurisdiction regardless "whether they originate in a newly fashioned regulatory scheme or possess a long line of common-law forebears." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 52, 109 S. Ct. 2782, 2795–96 (1989). And "[o]nce . . . a suit 'is brought within the bounds of federal jurisdiction,' an Article III court must decide it." *Jarkesy*, 603 U.S. at 127, 144 S. Ct. at 2131 (quoting *Stern*, 564 U.S. at 484, 131 S. Ct. at 2609). Claims that fall within a "public rights" exception, on the other hand, may be adjudicated by administrative agencies. *See Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334, 138 S. Ct. 1365, 1372–73 (2018).

The concept of public rights has been somewhat nebulous. In an early pivotal case, the Treasury Department declined to proceed through an Article III court to execute a distress warrant on property owned by a corrupt government revenue collector. The Supreme Court supplied what has become the standard definition of public rights. *See Murray's Lessee*, 59 U.S. (18 How.) at 284 ("[T]here are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which [C]ongress may or may not bring within the cognizance of the courts."). More recently, the Court explained that the "point" of *Murray's Lessee* is nothing extraordinary: "Congress may set the terms of adjudicating a suit when the suit could not otherwise proceed at all." *Stern*, 564 U.S. at 489, 131 S. Ct. at 2612. Also, the Court has cautioned against expansive readings of *Murray's Lessee* by emphasizing that there was an "unbroken tradition" of executing distress warrants without Article III that "long predat[ed] the founding."

*Jarkesy*, 603 U.S. at 128–29, 144 S. Ct. at 2132; *Murray's Lessee*, 59 U.S. (18 How.) at 281 ("[T]he means provided by the act . . . do not differ in principle from those employed in England from remote antiquity—and in many of the States.").

**2.**

The rising tide of public-rights jurisprudence reached its high-water mark decades ago when the Supreme Court attempted to define "public rights" as encompassing those instances in which Congress creates a "new cause of action, and remedies therefor, unknown to the common law." *Atlas Roofing Co. v. Occupational Safety and Health Rev. Comm'n*, 430 U.S. 442, 461, 97 S. Ct. 1261, 1272 (1977). The adjudication in that case arose under the Occupation Safety and Health Act of 1970 ("OSH Act"), an elaborate federal regulatory regime designed to promote safe working conditions. *Id.* at 444–45, 97 S. Ct. at 1263-64. The OSH Act directed that "[e]ach [covered] employer . . . shall comply with occupational safety and health standards" promulgated pursuant to its provisions. 29 U.S.C. § 654(a)(2). Those provisions in turn authorized the Secretary of Labor to promulgate agency rules, and a special commission was charged with prosecuting and adjudicating alleged violations. *Atlas Roofing*, 430 U.S. at 445–46, 97 S. Ct. at 1264. The commission imposed civil penalties on the Atlas Roofing Company for violating a safety rule "requiring the sides of trenches in unstable or soft material to be shored, . . . sloped, or otherwise supported by means of sufficient strength to protect the employees working within them." *Id.* at 447, 97 S. Ct. at 1265 (internal quotations marks omitted). Atlas Roofing argued that the adjudication involved private rights that entitled it to an Article III court. *Id.* at 448–49, 97 S. Ct. at 1265–66. The Supreme Court unanimously rejected that constitutional argument because, "when Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency." *Id.* at 455, 97 S. Ct. at 1269.

No. 24-60040

The scope of *Atlas Roofing* was tested a decade later when the Supreme Court considered whether the Constitution permitted a bankruptcy court, an Article I adjunct to Article III courts, to adjudicate a claim for fraudulent conveyance. *See Granfinanciera*, 492 U.S. at 36, 109 S. Ct. at 2787. Six justices held it did not because "[t]here [was] no dispute that actions to recover . . . fraudulent transfers were often brought at law in late 18th-century England." *Id.* at 43, 109 S. Ct. at 2791. The pertinent lesson from *Granfinanciera* was that, despite uncertainty fostered by *Atlas Roofing*, Congress cannot relegate actions that were essentially "suits at common law" to proceedings outside of Article III.[5] *Id.* at 56, 109 S. Ct. at 2798.

**3.**

In light of this background, the Supreme Court in *Jarkesy* considered whether the SEC could administratively adjudicate a civil penalty action for securities fraud subject to deferential Article III review. With a few words of caution, the Court warned that the public-rights doctrine "would swallow" the ordinary Article III requirement "[w]ithout . . . close attention to the basis for each asserted application of the doctrine." *Jarkesy,* 603 U.S. at 131, 144 S. Ct. at 2134. The Court concluded that an Article III adjudication was necessary in Jarkesy's case because the securities-fraud laws "borrow[ed] [their] cause of action from the common law" and were distinguishable from claims that involve public rights. *Id.* at 136–37, 144 S. Ct. at 1237. Several facts were identified by the Court as particularly important: (1) securities fraud claims "target[ed] the *same basic conduct* as common law fraud"; (2)

---

[5] Most cases concerning the private/public rights distinction involve claims that might have traditionally sounded at common law rather than equity. Because Article III expressly confers exclusive jurisdiction on federal courts over cases that sound in law and equity, any distinction would only become relevant if Intuit claimed a right to a jury trial under the Seventh Amendment. But it has not done so.

securities fraud laws "employ[ed] the *same terms of art*" as common law fraud; (3) securities fraud actions "operate[d] pursuant to *similar legal principles*" as common law fraud; and (4) civil penalties are a remedy that was traditionally available in courts of law. *Id.* at 134, 144 S. Ct. at 2136 (emphasis added).

The Court devoted an entire section of its opinion to distinguishing *Atlas Roofing* from more recent cases. A lengthy paragraph explained the distinctiveness of the OSH Act:

> Unlike the claims in *Granfinanciera* and this action, the OSH Act did not borrow its cause of action from the common law. . . . [Its] standards br[ought] no common law soil with them. Rather than reiterate common law terms of art, they instead resembled a detailed building code. . . . The purpose of this regime was not to enable the Federal Government to bring or adjudicate claims that traced their ancestry to the common law. . . . In both concept and execution, the [OSH] Act was self-consciously novel.

*Id.* at 136, 144 S. Ct. at 2137. As the Court summed up, "The novel claims in *Atlas Roofing* had never been brought in an Article III court." *Id.* at 140, 144 S. Ct. at 2139. None of this could be said of securities fraud actions prosecuted by SEC, which the Court concluded were not "unknown to the common law." *Id.* at 138, 144 S. Ct. at 2138 (citation omitted); *see also Basic Inc. v. Levinson*, 485 U.S. 224, 253, 108 S. Ct. 978, 994 (1988) (White, J., concurring in part and dissenting in part) ("[T]he case law developed . . . with respect to [the SEC antifraud provisions] has been based on . . . common-law doctrines of fraud and deceit.").

But the Court did not stop there. The Court cast doubt on whether *Atlas Roofing* remains good law: "*Atlas Roofing* represents a departure from our legal traditions . . . . Commentators . . . have often simply ignored the case . . . . Others who have considered it have offered nothing but a variety of

criticisms." *Jarkesy*, 603 U.S. at 138 & n.4, 144 S. Ct. at 2138 & n.4 ("The dissent chants '*Atlas Roofing*' like a mantra, but no matter how many times it repeats those words, it cannot give *Atlas Roofing* substance that it lacks."). The author of *Atlas Roofing* had already questioned its precedential value years earlier. *Granfinanciera*, 492 U.S. at 79, 109 S. Ct. at 2810 (White, J., dissenting) ("Perhaps . . . *Atlas Roofing* is no longer good law after today's decision."). Still, the Court stopped short of officially overruling *Atlas Roofing*. *See Jarkesy*, 603 U.S. at 136, 144. S. Ct. at 2137 ("[W]e need not reach the suggestion . . . that *Tull* and *Granfinanciera* effectively overruled *Atlas Roofing*.").

**4.**

These authorities are the backdrop for the conclusion that deceptive advertising claims under the FTC Act are "in their nature" traditional actions at law and equity and thus involve private rights that demand adjudication in an Article III court. We reject FTC's counterarguments that would include its cease-and-desist proceeding among those identified by the Supreme Court as involving public rights.

**B.**

Deceptive advertising claims brought under Section 5 require proof that a material representation "was likely to mislead customers acting reasonably under the circumstances." *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) (citing *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988)); *see also FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994) (citing *Cliffdale Assocs.*, 103 F.T.C. 110, 164–65 (1984)). Several causes of action traditionally recognized by courts of common law and equity required a similar showing, including the torts of deceit and fraud.

Eighteenth-century English courts held that an action for deceit lies at common law whenever there is a "false affirmation, made by the defendant

with intent to defraud the plaintiff, whereby the plaintiff receives damage." *Pasley v. Freeman*, 3 T. R. 51, 100 Eng. Rep. 450, 450 (K. B. 1789). In this country, the Restatement (First) of Torts summarized the longstanding claim for deceit in slightly different terms: a company that "fraudulently represent[s] that [its] goods . . . have ingredients or qualities which . . . they do not have" is liable in tort. RESTATEMENT (FIRST) OF TORTS § 761 (1939). American equity law, developed organically since the Founding era, has accounted for tortious deceit in the commercial context of deceptive advertising, where it was often called unfair competition. *See, e.g.*, *Motor Improvements v. A.C. Spark Plug Co.*, 80 F.2d 385, 386 (6th Cir. 1935) (holding that where misleading ads caused "injury to the plaintiff and fraud upon the public," "equity should . . . enjoin the sale" of products until the ads are changed); *see also City of Carlsbad v. W.T. Thackeray & Co.*, 57 F. 18, 18–20 (N.D. Ill. 1891) (enjoining the defendant company from marketing its salt under a name that might cause a consumer to believe it was made by the plaintiff company). Accordingly, the original FTC Act proscribed deceptive advertising as an "[u]nfair method[] of competition" under 15 U.S.C. § 45(a)(1).

FTC contends that deceit in this context was only actionable if a company palmed off another's goods as its own. *See Am. Washboard Co. v. Saginaw Mfg. Co.*, 103 F. 281, 284–85 (6th Cir. 1900). But FTC's restrictive construction is undermined by later decisions. *See Motor Improvements*, 80 F.2d at 386 ("[W]e cannot agree that the palming off by one competitor of his goods as those of another is the sole test of unfair competition. While it is a common method . . . it is not the sole method, certainly not the sole ground, for equitable intervention . . . and we do not view *American Washboard* . . . as holding that it is.").

The elements of fraud, a tort that was traditionally actionable at common law or equity depending on the circumstances, differ only slightly

from those of deceit. Fraud is actionable when there was a material representation, which was false, was known to be false when made or asserted without knowledge of its truth, was intended to be acted upon, was relied upon, and caused injury. *See Smith v. Richards*, 38 U.S. (13 Pet.) 26, 36 (1839) ("If, indeed, a man . . . make[s] a false representation, whether knowingly or not, by means of which he puts the party bargaining under a mistake upon the terms of the bargain, it is a fraud, and relievable in equity." (citing 1 Maddock's Chancery 208 (1817))); *see also FTC v. Algoma Lumber Co.*, 291 U.S. 67, 81, 54 S. Ct. 315, 321 (1934) (explaining in a case about misleading marketing that, although certain "practice[s] condemned [may] not amount to fraud as understood in courts of *law*," "there is a kind of fraud, as courts of *equity* have long perceived, in clinging to a benefit which is the product of misrepresentation" (emphases added)).

Unlike these traditional actions, Section 5 deceptive advertising claims do not require FTC to produce evidence of damage and fraudulent intent. But the Commission still must show that reasonable customers were likely to be misled by a false representation. Here, the Commission alleged that Intuit falsely represented that TurboTax products were free, although they are free only for a narrow group of customers. These allegations correspond with the *sine qua non* of common law fraud and deceit: a material representation that was false. Hence, claims of fraud, deceit, and deceptive advertising share a common core. An equivalent level of overlap between SEC securities fraud claims and common law fraud compelled the Supreme Court's conclusion that private rights were involved. *Compare, e.g.*, *Jarkesy*, 603 U.S. at 116, 144 S. Ct. at 2125 ("Section 206(b) . . . prohibits investment advisers from making 'any untrue statement of a material fact' . . . with respect to investors or prospective investors." (quoting 17 C.F.R. § 275.206(4)–8(a)(1))), *with Pauwels v. Deloitte LLP*, 83 F.4th 171, 189–90 (2d Cir. 2023) ("To state a claim for fraud under New York law, a plaintiff must

allege (1) a material misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." (quotation omitted)).

Striking similarities exist between FTC's administrative complaint and the Commission's opinion, on one hand, and classic terms of art associated with fraud and deceit. For example, FTC alleged that Intuit "has engaged in, and is engaging in, *deceptive business practices* in the advertising, marketing, distribution, and sale of TurboTax," and "Intuit *baits* consumers with deceptive ads and then compound[s] the deception with more false claims and buried disclosures." *Intuit, Inc.*, 2022 WL 1044862, at *1, *5 (F.T.C. Mar. 28, 2022) (Comm'n Complaint) (emphases added); *see also Intuit, Inc.*, 2024 WL 382358, at *14 n.12 (F.T.C. Jan. 22, 2024) (Comm'n Opinion) (citing a state-led lawsuit against Intuit for the same conduct that alleged "unfair, *fraudulent*, *and deceptive* business acts and practices" (emphasis added)). The Commission concluded in its opinion that Intuit employed unlawful business practices by running a "broad, enduring, and *willful*" "deceptive ad campaign." *Intuit, Inc.*, 2024 WL 382358, at *58 (emphasis added).[6] When rejecting Intuit's argument that few consumer complaints had been made, the Commission explained that "consumers' willingness to complain about *fraud* varies widely . . . with *mass frauds* associated with the lowest complaint rates." *Id.* at *35 (emphases added).

---

[6] Although this court has never addressed the issue, a minority of district courts has applied the heightened pleading requirements from Fed. R. Civ. P. 9(b) to Section 5 deceptive advertising claims that "soun[d] in fraud." *See FTC v. Lights of Am., Inc.*, 760 F. Supp. 2d 848, 852–55 (C.D. Cal. 2010); *FTC v. D-Link Sys., Inc.*, No. 3:17-CV-00039-JD, 2017 WL 4150873, at *2 (N.D. Cal. Sept. 19, 2017).

No. 24-60040

In *Jarkesy*, the Court also relied on similarities between SEC civil penalties and "money damages," "the prototypical common law remedy." 603 U.S. at 123, 144 S. Ct. at 2129. Here, too, the agency's remedy displays the similarities between cease-and-desist orders and equitable remedies. Courts have compared FTC Section 5 cease-and-desist orders to the traditional remedies that were available in courts of equity. *See, e.g.*, *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 178, 94 S. Ct. 414, 422 (1973) ("*Regal Knitwear* treated a Board cease-and-desist order as 'somewhat analogous' to . . . an injunction." (italics added) (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14, 65 S. Ct. 478, 481 (1945))); *see also NLRB v. Express Pub. Co.*, 312 U.S. 426, 433, 61 S. Ct. 693, 698 (1941) (noting that a cease-and-desist order, "like the injunction order of a court, [must] state with reasonable specificity the acts which the respondent is to do or refrain from doing"); *Globe Cotton Mills v. NLRB*, 103 F.2d 91, 93 (5th Cir. 1939) (explaining that a cease-and-desist order is "analogous to an injunction"); Amy Marshak, *The Federal Trade Commission on the Frontier: Suggestions for the Use of Section 5*, 86 N.Y.U. L. Rev. 1121, 1128 (2011) ("The Commission's primary tool is a cease-and-desist order, which is largely equivalent to an injunction . . . ." (citations omitted)).

Despite the demonstrated similarities between Section 5 deceptive advertising claims and common-law fraud and deceit, FTC contends that there is no meaningful connection. On the contrary, courts observed in the years immediately following the FTC Act's passage in 1914 that its "unfair methods of competition" standard was derived from the common law. The Seventh Circuit was unequivocal: "The [C]ommissioners . . . are to exercise their common sense, as informed by their knowledge of the . . . common law . . . . The trader is entitled to his day in court, and there the same principles and tests that have been applied under the common law . . . are expected by Congress to control." *Sears, Roebuck & Co. v. FTC*, 258 F. 307,

311 (7th Cir. 1919). Initially, the Supreme Court concurred, observing that the unfair-methods-of-competition standard permitted the Commission to address traditional wrongs that had been previously identified by the judiciary. *See FTC v. Gratz*, 253 U.S. 421, 427, 40 S. Ct. 572, 575 (1920) ("The words 'unfair method of competition' . . . are clearly inapplicable to practices never heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud, or oppression . . . ."). And during this era of its FTC Act jurisprudence, the Court held that deceptive advertising was a traditional wrong that the Commission could address. *See FTC v. Winsted Hosiery Co.*, 258 U.S. 483, 494, 42 S. Ct. 384, 386 (1922) (Brandeis, J.) ("That a person is a wrongdoer who so furnishes another with the means of consummating a fraud has *long been a part* of the law of unfair competition." (emphasis added)).[7] Only *after* identifying deceptive advertising as a traditional wrong did the Court expand its understanding of the FTC Act and hold "[n]either the language nor the history of the act suggests that Congress intended to confine the forbidden methods to fixed and unyielding categories . . . . The act undoubtedly was aimed at all the familiar methods of law violation . . . . But . . . it also had a broader purpose . . . ." *FTC v. R.F. Keppel & Bro.*, 291 U.S. 304, 310, 54 S. Ct. 423, 425 (1934).

---

[7] It makes no difference that the FTC bases its deceptive advertising claims in this case on a separate phrase that Congress later added to the FTC Act for "unfair or deceptive acts or practices." 15 U.S.C. § 45(a)(1). The Wheeler-Lea Act of 1938, which codified this addition, did nothing to sever the FTC Act from its well-recognized common law roots; it merely expanded FTC authority by eliminating a requirement under the "unfair methods of competition" standard that the FTC prove harm to competition. *See Exposition Press, Inc. v. FTC*, 295 F.2d 869, 876 (2d Cir. 1961) (Friendly, J., dissenting) ("[T]he 1938 amendment, designed to eliminate the need of proving a potential adverse effect on competition, did not eliminate the need of establishing the potentiality of the kind of adverse effect of which the law customarily takes note.").

FTC attempts to distinguish its claims in this case from various traditional actions, including those already discussed. It contends, for example, that common law remedies for deceptive advertising required proof that sales "would have gone to the plaintiff rather than to other competitors in the market." *Mosler Safe Co. v. Ely-Norris Safe Co.*, 273 U.S. 132, 134, 47 S. Ct. 314, 314 (1927). Further, common-law deceit often proved incapable of affording plaintiffs relief because merchants' opinions were protected even if they misrepresented a product; the principle of caveat emptor was detrimental to consumers; and privity of contract was required. The Commission stresses that none of these obstacles stand in the way of deceptive advertising claims brought under Section 5.

The technical distinctions that FTC cites fail to disprove that private rights are at stake. Critically, the Court in *Jarkesy* identified similar distinctions between federal securities fraud and common law fraud. 603 U.S. at 126, 144 S. Ct. at 2131 ("[F]ederal securities fraud and common law fraud are [not] identical. In some respects, federal securities fraud is narrower . . . . In other respects, federal securities fraud is broader."). Specifically, the Court acknowledged that SEC enjoyed a more lenient burden of proof and could pursue civil penalties without proving harm. *Id.* Yet the Court held that the "relationship" between securities fraud actions and common law fraud was "close," "confirm[ing]" that an SEC action is "legal in nature." *Id.* (citation omitted). That is no less true here. There is a significant difference between circumstances in which *relief has been traditionally limited*, or otherwise difficult to obtain, and those in which *a claim is wholly unavailable*, unrecognized by the common law, or unmoored from any kind of traditional action. Mere obstacles to relief do not compel the conclusion that there was no actionable wrong, and eliminating obstacles to relief does not make an actionable wrong no longer "traditional" in its nature. *See also AT&T, Inc. v. FCC*, 149 F.4th 491, 499 (5th Cir. 2025)

("However 'technical' section 222 may be, its substance is closely analogous to a negligence action . . . . [T]he statutory action need not be 'identical' to a common law analogue."), *cert. granted sub nom.*, *FCC v. AT&T, Inc.*, No. 25-406, 2026 WL 73092 (Jan. 9, 2026).

FTC avoids the conclusion that private rights are involved by comparing its Section 5 deception standard to the workplace-safety standards in *Atlas Roofing*, which the Court held implicated public rights. But a blanket prohibition on "unfair or deceptive acts or practices" does not remotely "resemble[] a detailed building code" like the workplace safety standards promulgated under the OSH Act. *Jarkesy*, 603 U.S. at 137, 144 S. Ct. at 2137. Moreover, the Court emphasized that the "novel claims in *Atlas Roofing* had never been brought in an Article III court." *Id.* at 140, 144 S. Ct. at 2139. Not so here. Since the 1970s, the FTC Act has unambiguously authorized the Commission to prosecute Section 5 deceptive advertising claims in federal court. 15 U.S.C. § 53(b); *see AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 73–74, 141 S. Ct. 1341, 1346–47 (2021) ("Beginning in the late 1970s, the Commission began to use . . . the words 'permanent injunction[]' to obtain court orders for redress of various kinds . . . without prior use of the administrative proceedings in § 5 . . . . [T]he Commission presently uses § 13(b) . . . with great frequency." (citations omitted)). And in *Jarkesy*, the Court noted, "Congress had authorized the SEC to bring [fraud] actions in Article III courts and still authorizes the SEC to do so today." 603 U.S. at 140, 144 S. Ct. at 2139 (citation omitted).

In sum, there is overwhelming evidence that Section 5 of the FTC Act did not create a new duty for merchants to refrain from deceptive advertising. That duty long predated the FTC Act and could be enforced by private parties in actions at common law or equity for fraud, deceit, or unfair competition. The Commission contends that the FTC Act "expunged" "old soil," but this *ipse dixit* cannot overcome the weight of contrary

evidence. Section 5 may well constitute a *more effective tool* than the common law for combatting deceptive advertising. Ultimately, that is beside the point. Congress can modify the common law and deal the public a better hand by expanding remedies. *See Pan Am. World Airways, Inc. v. United States*, 371 U.S. 296, 306, 83 S. Ct. 476, 483 (1963) (explaining that "unfair practices" is a "broader concept than the common-law idea of unfair competition" (citation omitted)). But expanding remedies does not allow Congress to relegate claims of common law pedigree to adjudication by non-Article III bureaucrats. FTC's action here (1) targets the same conduct as traditional actions; (2) operates pursuant to similar principles; and (3) invokes recognized terms of art. The Commission does not (and could not) contend that this is a matter in which "the political branches had traditionally held exclusive power." *Jarkesy*, 603 U.S. at 130, 144 S. Ct. at 2133 (citing *Ex parte Bakelite Corp.*, 279 U.S. 438, 458, 460–61, 49 S. Ct. 411, 416–17 (1929)). The close relationship between Section 5 and traditional actions proves that private rights are at stake.

## C.

FTC and amici advance a litany of other arguments in hopes of circumventing *Jarkesy* and fortifying the claim that it adjudicated public rights. We take them in turn.

### 1.

FTC argues that, because this proceeding involves public rights, internal agency adjudication is fine. But "since *Murray's Lessee*," the Supreme Court has "typically evaluated the legal basis for the assertion of the doctrine with care." *Id.* at 131, 144 S. Ct. at 2133–34. "The public rights exception is, after all, an *exception*." *Id.*, 144 S. Ct. at 2134 (emphasis in original). We exercise similar caution here. The Commission posits that public rights are at issue because Section 5 "permits the government to

pursue equitable remedies on the public's behalf." The Court, however, repudiated the same circular definition of public rights in *Jarkesy*. *Id.* at 139, 144 S. Ct. at 2138–39 ("Even as *Atlas Roofing* invoked the public rights exception, the definition it offered . . . was circular. The exception applied . . . in cases in which . . . the Government sues in its sovereign capacity to enforce public rights created by statutes." (quotations omitted)). The Constitution does not imply a "public interest" exception to Article III "judicial Power" for a legal claim that otherwise "trace[s] [its] ancestry to [actions recognized at] the common law." *Id.* at 137, 144 S. Ct. at 2137.

The Commission relies on *FTC v. Klesner*, 280 U.S. 19, 25–27, 50 S. Ct. 1, 3 (1929), an enforcement action dismissed because FTC failed to explain how the action was in the public interest. The Court briefly contrasted actions "in the public interest" with those brought by "private traders to enjoin unfair competition," where invasion of a "private right" *must* be shown "because otherwise the plaintiff has not suffered an injury." *Id.* at 27, 50 S. Ct. at 3. But the Court did not discuss Article III limits, nor did it suggest that FTC proceedings could *never* implicate private rights. Nothing in the Court's more recent Article III jurisprudence indicates that private rights hinge solely on whether an individual suffered harm. In fact, *Jarkesy* held that SEC's action involved private rights even though courts had "not typically interpreted federal securities fraud to require a showing of harm to be actionable by the SEC." 603 U.S. at 126, 144 S. Ct. at 2131. *Klesner* is not as broad as FTC contends; the Court merely explained that FTC actions are not *conditioned* on there being a private right at stake, and it acknowledged that, even in private actions, "proof that the public is deceived is an essential element of [unfair competition]." 280 U.S. at 27, 50 S. Ct. at 3. The instant proceeding involves private rights under the Court's caselaw because deceptive advertising claims relate to traditional actions, even though they vindicate the public interest.

FTC and amici invoke cases that they characterize as involving public rights or otherwise excusing the Article III tribunal. But none of the cases concern, or are even tangentially related to, deceptive advertising actions. In *Union Bridge Co. v. United States*, 204 U.S. 364, 27 S. Ct. 367 (1907), for example, the Court affirmed the Secretary of War's determination to eliminate an unreasonable obstruction to the free navigation of the Allegheny River. Regulating the flow of commerce on navigable rivers is closely analogous to traditional public rights recognized by *Jarkesy*. Similarly, *Block v. Hirsh*, 256 U.S. 135, 41 S. Ct. 458 (1921), upheld a Washington, D.C., rent control law administered by a government agency, which dated to the exigencies of World War I. The case turned on interference with property rights, not on the divestiture of Article III federal courts, and it stands in tension with more recent Court precedents. *See Granfinanciera*, 492 U.S. at 71 n.1, 109 S. Ct. at 2806 n.1 (White, J., dissenting) (suggesting that the Court's opinion "c[ould] be read as overruling or severely limiting the relevant portions" of several cases, including *Block*). In *Crowell v. Benson*, 285 U.S. 22, 52 S. Ct. 285 (1932), the Court approved administrative adjudication of disputes under the Longshoremen's and Harbor Workers' Compensation Act. *Id.* at 36, 52 S. Ct. at 286–87. In the course of explaining its conclusion, the Court cited one FTC case in a footnote as a "[f]amiliar illustration[]" of an administrative agency's adjudicating public rights. *Id.* at 50–51 & 51 n.13, 52 S. Ct. at 292 & n.13 (citing *Int'l Shoe Co. v. FTC*, 280 U.S. 291, 50 S. Ct. 89 (1930)). The *International Shoe* case, however, concerned antitrust issues, not the scope of non-Article III adjudication. As Justice Gorsuch pointed out, "*Crowell* . . . fell within federal courts' admiralty jurisdiction, and tribunals sitting in admiralty in England and America alike had long heard certain matters falling within the public rights exception." *Jarkesy*, 603 U.S. at 156, 144 S. Ct. at 2148 (Gorsuch, J., concurring) (citation

omitted). *Crowell* thus says very little to support FTC's administrative adjudication proceeding.

Contrary to FTC's position, the Supreme Court's more recent precedents also fail to support its use of in-house ALJs. In *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 105 S. Ct. 3325 (1985), the Court upheld binding arbitration to allocate compensation among prospective licensees in connection with the Federal Insecticide, Fungicide, and Rodenticide Act. *Id.* at 571–74, 105 S. Ct. at 3327–30. Consent was key to the Court's decision. *See id.* at 589, 105 S. Ct. at 3337 ("Congress has the power . . . to authorize an agency administering a complex regulatory scheme to allocate costs and benefits among *voluntary participants* in the program without providing an Article III adjudication. It also has the power to condition issuance of registrations or licenses on compliance with agency procedures." (emphasis added)); *see also Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 674, 135 S. Ct. 1932, 1942 (2015) ("[D]uring the early years of the Republic, federal courts, with the *consent* of the litigants, regularly referred adjudication of entire disputes to non-Article III referees, masters, or arbitrators . . . ." (emphasis added) (quotation omitted)). Consent is lacking here.

FTC fares no better with respect to *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 106 S. Ct. 3245 (1986), where the Court upheld the Commodity Futures Trading Commission's ("CFTC") adjudication of a common law counterclaim in a CFTC administrative-reparations proceeding. For several reasons, the Court concluded that Schor waived any right he may have possessed to try the counterclaim before an Article III court. *Id.* at 849, 106 S. Ct. at 3256; *see also id.*, 106 S. Ct. at 3255–56 ("[T]he relevance of concepts of waiver . . . is demonstrated by . . . *Northern Pipeline*, in which the absence of consent to an initial adjudication . . . was relied on as a significant factor in determining that

Article III forbade such adjudication." (citations omitted)); *see also Wellness Int'l Network*, 575 U.S. at 676, 135 S. Ct. at 1943 ("Leaning heavily on the importance of Schor's consent, the Court found no [Article III] structural concern . . . ."). *Schor* is inapplicable because Intuit did not file claims before the Commission, and Intuit has consistently maintained its right to an Article III adjudication.

The remaining cases that FTC cites for its broad conception of public rights merit little discussion. The Court's statement that the FTC does not "vindicate private rights," but is concerned with "the protection of the public interest," had to do with the Commission's power to authorize a name-registration proceeding, not with its ability to adjudicate in lieu of Article III courts. *See Am. Airlines v. N. Am. Airlines*, 351 U.S. 79, 80–81, 83, 85, 76 S. Ct. 600, 602–05, (1956). The decision in *Akzo N.V. v. Int'l Trade Comm'n*, 808 F.2d 1471, 1488 (Fed. Cir. 1986), involved plenary congressional power over commerce with foreign nations. Other cases implicated well-known public-rights exceptions to Article III. *See Oil States Energy Servs., LLC*, 584 U.S. at 334–37, 138 S. Ct. at 1373–75 (inter partes patent review); *Marine Shale Processors, Inc. v. EPA*, 81 F.3d 1371, 1376 (5th Cir. 1996) (adjudication of government permits); *see also AT&T, Inc.*, 149 F.4th at 500 (listing traditional public-rights cases identified in *Jarkesy* such as "revenue collection, foreign commerce, immigration, tariffs, tribal relations, public lands, public benefits, and patents").

### 2.

In a post-argument letter, FTC cites a handful of decisions from other circuits that ostensibly rejected "[s]oon after the FTC Act's passage . . . the claim that FTC adjudication violates Article III by vesting the Commission with 'judicial powers.'" *See Nat'l Harness Mfrs.' Ass'n v. FTC*, 268 F. 705, 707 (6th Cir. 1920) ("The act delegates to the commission no judicial

powers . . . ."); *Ark. Wholesale Grocers' Ass'n v. FTC*, 18 F.2d 866, 870 (8th Cir. 1927) ("The [FTC] is an administrative body; it is a fact-finding body. It . . . is within the power of Congress to delegate to an administrative body . . . the duty and power of finding facts upon which subsequent orders may be made."); *FTC v. Balme*, 23 F.2d 615, 621 (2d Cir. 1928) ("Section 5 has so often been considered and held to be constitutional by the courts that it is not necessary now to consider these objections to its constitutionality."); *FTC v. A. McLean & Son*, 84 F.2d 910, 912 (7th Cir. 1936) ("They conten[d] that section 5 of the act violates the federal constitutional mandate of separation of governmental functions . . . . We think there is no merit in this contention."); *Ostler Candy Co. v. FTC*, 106 F.2d 962, 964 (10th Cir. 1939) ("[T]he [cease-and-desist] order shall become final upon the expiration of the time allowed for the filing of a petition for review . . . . [Tha]t does not transform the order into the equivalent of a . . . judgment . . . and the provision for judicial review meets the requirements of due process."). Although these cases show that courts rejected challenges to FTC adjudication in its earliest days, they do not expressly consider the issue through the private- and public-rights framework; the Court's decision in *Jarkesy* therefore calls these cases into question.

Relatedly, FTC urges reliance on a district court opinion that predated *Jarkesy* in the Supreme Court but purported to reject the private rights basis for Article III adjudication. *See Meta Platforms, Inc. v. FTC*, 723 F. Supp. 3d 64, 90–93 (D.D.C. 2024), *aff'd*, 2024 WL 1549732, at *3 (D.C. Cir. 2024) (unpublished) (per curiam). The decision is not binding on this court, was framed in a different procedural posture, and pertinent to our conclusion, acknowledged that the "common law tort of deceit and a Section 5 violation are similar." *See id.* at 92.

**3.**

Attempting to put this case in the *Atlas Roofing* and *Union Bridge* public rights camp, FTC also cites cases where the Court explained that Section 5 does not require the Commission to limit its regulation to traditional wrongs. *See, e.g.*, *Keppel*, 291 U.S. at 310, 54 S. Ct. at 425 ("Neither the language nor the history of the act suggests that Congress intended to confine the forbidden methods to fixed and unyielding categories."); *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239–40, 92 S. Ct. 898, 903 (1972) (Congress "explicitly considered, and rejected, the notion that it reduce the ambiguity of the phrase 'unfair methods of competition' by tying the concept of unfairness to a common-law . . . standard . . . ."). These are inapposite. Neither case involved the Commission's regulation of deceptive advertising, and neither discussed whether *deceptive advertising* was considered a traditional wrong at common law. Section 5 may authorize FTC to assert certain claims unknown to the common law (we need not consider the constitutionality of those other cases today), but this case deals with deceptive advertising. As discussed above, deceptive advertising actions relate to traditional actions, have common law roots, and implicate private rights.

FTC falls back on the proposition that Congress has authorized agency adjudication for 110 years, and eliminating its adjudicative authority would largely "dismantle" the FTC Act. That purposive argument is wrong for several reasons. First, the Supreme Court has said it is "unclear how practice could transmute a private right into a public one," and "practical considerations alone can[not] justify extending the scope of the public rights exception." *Jarkesy*, 603 U.S. at 131 n.2, 132, 144 S. Ct. at 2134 & n.2 (quotations omitted). Moreover, "the presence of the United States as a proper party to the proceeding is . . . [in]sufficient" by itself to implicate public rights. *Id.* at 135, 144 S. Ct. at 2136 (quotation omitted). Equally

important, since the 1970s, the FTC has had the power to "proceed directly to court (prior to issuing a cease and desist order) to obtain a 'temporary restraining order or a preliminary injunction,' and . . . 'in proper cases,' to obtain a court-ordered 'permanent injunction.'" *AMG Cap. Mgmt., LLC*, 593 U.S. at 72, 141 S. Ct. at 1346 (2021) (quoting 15 U.S.C. § 53(b)). And finally, this case determines FTC's authority to adjudicate only deceptive advertising claims, 15 U.S.C. § 45(a)(2). We do not decide the same question for any other "unfair methods of competition" or other "unfair or deceptive acts or practices." *Id.* § 45(a)(1).

### D.

Intuit seeks reversal of the FTC's cease-and-desist order with instructions to dismiss. Dismissal is premature. We hold that FTC's enforcement action must proceed in federal court. Several consequences may follow from this: the standard of proof required on remand may be elevated from substantial evidence to a preponderance; the agency will have to explain the necessity of any order, given that Intuit stopped running the offending ads years ago; and the practicability, scope, and longevity of a cease-and-desist order will have to be reconsidered. These "known unknowns" require that we pretermit decision on issues that may arise on remand.

### III. CONCLUSION

Caselaw from soon after the passage of the FTC Act reflects a widespread understanding that the statute encompassed common law actions for "deceit," "fraud," and "unfair use." Deceptive advertising claims enforceable by the FTC arose from these traditional concepts. As former FTC Chair Timothy Muris put it, the Commission "help[s] to reinforce the common law rules of exchange" when it acts under its authority to "stop unfair or deceptive acts or practices." Timothy Muris, Chairman, Fed.

No. 24-60040

Trade Comm'n, *Remarks before the Aspen Summit, Cyberspace and the American Dream, The Progress and Freedom Foundation*, 2003 WL 21979851, at *6 (Aug. 19, 2003).  Precedent, particularly the *Jarkesy* decision, confirms that FTC's adjudication of deceptive advertising claims does not involve public rights, and the agency must therefore redress deceptive advertising in Article III courts.

For the foregoing reasons, we GRANT Intuit's petition for review, VACATE the order below, and REMAND to FTC for proceedings consistent with this opinion.

No. 24-60040

James C. Ho, *Circuit Judge*, concurring:

Our Constitution establishes three branches of government, not four. *See*, *e.g.*, *Ameron, Inc. v. U.S. Army Corps of Engineers*, 787 F.2d 875, 892 (3rd Cir. 1986) (Becker, J., concurring in part); *Ass'n of American Railroads v. U.S. Dep't of Transp.*, 821 F.3d 19, 30–31 (D.C. Cir. 2016); *Consumers' Research v. FCC*, 109 F.4th 743, 787 (5th Cir. 2024) (Ho, J., concurring). It vests all of the legislative powers granted by our Nation's charter in Congress. *See* U.S. Const. art. I, § 1. It vests the executive power of the United States in the President. *See id.* art. II, § 1. And it vests the judicial power of the United States in the Supreme Court and in such inferior courts as Congress may establish. *See id.* art. III, § 1.

Enforcing the separation of powers "isn't about protecting institutional prerogatives or governmental turf." *Gundy v. United States*, 588 U.S. 128, 156 (2019) (Gorsuch, J., dissenting). Our Founders separated power to preserve liberty. "By diffusing power across the three rival branches of government, we make it difficult for government to gang up on the citizen." *Voices for Int'l Bus. and Educ., Inc. v. NLRB*, 905 F.3d 770, 780–81 (5th Cir. 2018) (Ho, J., concurring).

If the Constitution separates power to preserve liberty, then the Federal Trade Commission Act of 1914 combines power to undermine liberty. *See*, *e.g.*, *PHH Corp. v. CFPB*, 881 F.3d 75, 169 (D.C. Cir. 2018) (Kavanaugh, J., dissenting) (agencies like the FTC "exercise[] combined powers: the executive power of enforcement, the legislative power of issuing binding legal rules, and the judicial power of deciding adjudications"). Because of administrative agencies like the FTC, Americans are increasingly governed by a "headless fourth branch of government" — "a potent brew of executive, legislative, and judicial power." *City of Arlington v. FCC*, 569 U.S. 290, 314, 327 (2013) (Roberts, C.J., dissenting).

Our Founders would've been deeply troubled by a creature like the FTC. James Madison famously observed that the "accumulation of all powers, legislative, executive, and judiciary, in the same hands, . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47, at 324 (J. Cooke ed. 1961). One member of the First Congress warned that such consolidations of power would become "a monster of a peculiar enormity," with "two heads, three heads, or four heads," or perhaps "without any head at all." 1 Annals of Cong. 531 (1789) (statement of Rep. Vining). Fortunately, just as the three-headed beast that terrorized Harry Potter and his friends could be put to sleep simply by playing music, *see* Harry Potter and the Sorcerer's Stone 275–76 (1998), all we need to do to restrain the FTC is to restore the Constitution.

The FTC's "combined powers" present not one, but multiple constitutional challenges. To the extent that the Commission promulgates legal rules governing private activity, it challenges the vesting of legislative power in the Congress. To the extent that members of the FTC enforce the law while insulated from removal by the President, it challenges the vesting of Article II power in our Nation's Chief Executive. And to the extent that private rights are adjudicated in tribunals controlled by the Commission, it challenges the vesting of the judicial power in the federal courts.

The Supreme Court is presently considering whether the insulation of FTC officials from Presidential removal can be reconciled with Article II. *See Trump v. Slaughter*, 146 S. Ct. 18 (2025) (granting certiorari to decide whether *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), should be overruled). *See also Feds for Medical Freedom v. Biden*, 63 F.4th 366, 390 (5th Cir. 2023) (en banc) (Ho, J., concurring) ("[T]he President *should* possess the constitutional authority under Article II to remove his subordinates from office. In reality, however, the President actually controls

surprisingly little of the Executive Branch. . . . And that presents a rather curious distortion of our constitutional structure.") (citations omitted).

Meanwhile, our court today confronts the challenges that the FTC's adjudicative powers present to Article III. "Under our Constitution, the 'judicial power' belongs to Article III courts and cannot be shared with the Legislature or the Executive." *B & B Hardware, Inc. v. Hargis Industries, Inc.*, 575 U.S. 138, 171 (2015) (Thomas, J., dissenting). Agency adjudication undermines judicial independence and impartiality by subjecting the exercise of judicial power to the agency's will. It "threatens to sap the judicial power as it exists under the Federal Constitution, and to establish a government of a bureaucratic character alien to our own system." *Id.* at 173 (quotations omitted).

Our Founders did not "take it for granted . . . that independent judges will hear our cases and controversies." *Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 584 U.S. 325, 346 (2018) (Gorsuch, J., dissenting). "Before the Revolution, colonial judges depended on the Crown for their tenure and salary and often enough their decisions followed their interests." *Id.* "The problem was so serious that the founders cited it in their Declaration of Independence (see ¶ 11)." *Id.* They "went to great lengths to guarantee a degree of judicial independence for future generations that they themselves had not experienced." *Id.*

That said, Supreme Court precedent has long "recognized a class of cases concerning what [the Court has] called 'public rights,'" which need not be adjudicated in Article III tribunals. *SEC v. Jarkesy*, 603 U.S. 109, 128 (2024). "Such matters historically could have been determined exclusively by the executive and legislative branches, even when they were presented in such form that the judicial power was capable of acting on them." *Id.* (quotations omitted).

No. 24-60040

This so-called "public rights exception" to Article III finds firm support in Supreme Court precedent. *See id.* at 127–32. But "[i]t has no textual basis in the Constitution." *Id.* at 131. It "must therefore derive instead from background legal principles." *Id.* "Without such close attention to the basis for each asserted application of the doctrine, the exception would swallow the rule." *Id. See also Calcutt v. FDIC*, 37 F.4th 293, 349 (6th Cir. 2022) (Murphy, J., dissenting) ("There must be *some* limit to the government's ability to dissolve the Constitution's usual separation-of-powers and due-process protections by waving a nebulous 'public rights' flag at a court.").

So if the exception "allow[s] the Executive Branch to resolve certain matters free from judicial involvement in the first instance," then any attempt to invoke that exception had better be supported by a "serious and unbroken historical pedigree." *Jarkesy*, 603 U.S. at 152–53 (Gorsuch, J., concurring). "[P]ublic rights are a narrow class defined and limited by history" and "has traditionally included the collection of revenue, customs enforcement, immigration, and the grant of public benefits." *Id.*

As our court rightly concludes, the FTC action presented here falls far short of the rigorous historical standard required by Supreme Court precedent. Accordingly, I'm pleased to join the court's decision today in full.